UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

STEPHEN JOHN KARES,

                Petitioner,

v.

CONNIE HORTON,

                Respondent.

_____/

Case No. 2:19-cv-7

Honorable Hala Y. Jarbou

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Stephen John Kares is incarcerated with the Michigan Department of Corrections at the Lakeland Correctional Facility (LCF) in Coldwater, Branch County, Michigan. On August 30, 2012, following a three-day bench trial in the Shiawassee County Circuit Court, Petitioner was convicted of third-degree criminal sexual conduct (CSC-III), in violation of Mich. Comp. Laws § 750.520d. On September 29, 2012, the court sentenced Petitioner as a fourth habitual offender, Mich. Comp. Laws § 769.12, to a prison term of 25 years to 58 years, 4 months, to be served consecutively to a sentence for assault for which Petitioner was on parole when he committed the CSC-III offense.

Petitioner filed his habeas corpus petition in this Court on or around December 21, 2018. Under Sixth Circuit precedent, the application is deemed filed when handed to prison authorities for mailing to the federal court. *Cook v. Stegall*, 295 F.3d 517, 521 (6th Cir. 2002). Petitioner signed his application on December 21, 2018. (Pet., ECF No. 1, PageID.9.) The petition was received by the Court on January 9, 2019. For purposes of this Report and Recommendation,

I have given Petitioner the benefit of the earliest possible filing date.  *See Brand v. Motley*, 526 F.3d 921, 925 (6th Cir. 2008) (holding that the date the prisoner signs the document is deemed under Sixth Circuit law to be the date of handing to officials) (citing *Goins v. Saunders*, 206 F. App'x 497, 498 n.1 (6th Cir. 2006)).

The petition raises eleven grounds for relief, as follows:

I.      Petitioner was denied his due process right to a fair trial by the admission of hearsay evidence over a defense objection.

II.     Trial court applied inaccurate information and engaged in judicial fact finding to increase Petitioner's sentence.

III.    Petitioner was denied his due process rights by the trial court giving an improper lesser offense instruction.

IV.     Petitioner was denied his constitutional right to due process and equal protection by the State of Michigan ruling "good cause" and "actual prejudice" were not demonstrated.

V.      Petitioner was denied a fair trial by the prosecutor misrepresenting DNA evidence to the jury.

VI.     Petitioner was denied his due process rights by the prosecutor suppressing exculpatory evidence in its possession.

VII.    Petitioner was denied his due process right to a fair trial by the prosecution failing to produce endorsed res gestae witnesses at trial.

VIII.   Petitioner was denied his due process right to adequate notice to seek a sentence enhancement.

IX.     Trial counsel was ineffective for failing to conduct an adequate investigation and present a complete defense.

X.      Appellate counsel was ineffective by failing to raise meritorious issues on direct appeal resulting in prejudice to Petitioner's appeal.

XI.     Petitioner was deprived of his right to equal protection when he was denied testing of forensic evidence.

2

(Am. Pet., ECF No. 10, PageID.135–150.)[1]   Respondent has filed an answer to the petition (ECF No. 20) stating that the grounds should be denied because the petition is untimely, most of the grounds are procedurally defaulted, several of the grounds are not cognizable on habeas review, and all of the grounds are meritless.  Upon review and applying the standards of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA), I conclude that the petition is untimely.  Nonetheless, because that conclusion depends upon resolution of an issue of first impression in this district and circuit—whether or not a motion seeking DNA testing under Mich. Comp. Laws § 770.16 is a petition for collateral review that tolls the running of the period of limitation—and because that is a question upon which reasonable minds could certainly differ, I have also considered the merits of the grounds raised.  I further conclude that Petitioner's habeas grounds are either procedurally defaulted or meritless or both.  Accordingly, I recommend that the petition be denied.

<u>Discussion</u>

## I.     Factual allegations

The Michigan Court of Appeals summarized the testimony elicited at trial as follows:

> Defendant knew the 16 year old victim because he dated her mother, and the victim had been over to his apartment on a number of occasions.  On the day of the assault, defendant texted the victim and offered to pay her money if she would clean his horse saddle.  Later that day, defendant texted the victim that he would be home soon, he bought her a pack of cigarettes (as he had done in the past), and he purchased a gift for her from Goodwill.
>
> The victim asked a friend to drive her to defendant's apartment.  When she arrived, defendant showed her the saddle, but said that she did not need to clean it right

---

[1] Petitioner filed his amended petition on May 17, 2019.  The amended petition added habeas ground XI, for which Petitioner had not exhausted his state court remedies at the time he filed his initial petition, as explained fully below.

away. The victim and defendant were talking and smoking a cigarette in the living room when he offered to help her get emancipated, which is something they had talked about before. Defendant also gave her the gift from Goodwill, which was a pair of earrings.

The victim cleaned the saddle, and defendant eventually went into his bedroom. Defendant then asked the victim if a pair of pants in the bedroom were hers, which prompted the victim to walk toward the bedroom. Defendant then told the victim that they needed to talk, and closed the bedroom door. He then caressed her face, and the victim told him no. Because the victim began to whimper and shake, defendant said "stop, don't make me hurt you." Defendant then kissed the victim and said "what do you think I'm doing this for? What do you think I'm doing all this for you for?" The victim knew that he was referring to the emancipation offer and the purchase of cigarettes.

Defendant told the victim to walk over by the bed and take her clothes off, which she did. He then grabbed a camera, took his pants off, and told the victim to lie down on the bed. When she complied, he opened her legs, spread open her vaginal area to take a picture, and told her that if she told anyone he would distribute the photographs everywhere. He then ordered her to sit up, and forced her to perform oral sex on him. He next ordered her to lie down on the bed, and he inserted his penis into her vagina.

Defendant eventually stood up and put his pants back on. The victim got dressed but did not run because she was afraid he would catch her. Defendant said that he thought she would be more into it, and asked if she had sex before. They eventually proceeded back into the living room, and the food defendant ordered earlier arrived. While the victim went back to cleaning the saddle, she felt threatened because defendant told her that he did not want the police showing up at his door. The victim's friend arrived to pick her up, and the victim told defendant not to worry that she would not tell.

However, after driving away, the victim told her friend, and eventually her mother, that defendant raped her. She had a rape kit examination performed, and a sexual-assault nurse testified that the victim relayed to her what happened. Thus, the nurse conducted a full body assessment of the victim, including a detailed genital assessment. She obtained a urine sample to check for infection or prior pregnancy, and provided the victim with medications to prevent pregnancy and infection. The nurse testified that near the victim's anus she observed a half-millimeter tear that could be consistent with forced or consensual sexual contact. She also collected various samples, including a sample of a white substance at the victim's cervix and a vaginal swab. An employee at the Michigan State Police Forensic Science Division testified that the anal and cervical swabs were tested and resulted in a match to defendant's DNA.[1]

4

Defendant testified at trial, and while he admitted that the victim came over to his apartment to clean the saddle, he claimed that no sexual contact occurred, and he did not know why the victim accused him of such. He testified that he had sexual intercourse with a different woman three or four days before, and had disposed of a vaginal condom in the trash.

[1] Defendant questioned the prosecution's witnesses regarding the nurse's report, which did not show a check mark that anal swabs or vaginal smears were collected.

(Mich. Ct. App. Op., ECF No. 21-12, PageID.1073–1074.)  Petitioner does not challenge the court of appeals' recounting of the trial testimony.  Indeed, Petitioner's statements of the facts in his state court briefs are more detailed, but generally consistent with the account provided by the appellate court.  The undersigned will provide additional detail regarding the trial testimony where it is relevant to an analysis of the issues Petitioner has raised.

The prosecutor charged Petitioner with two counts of first-degree criminal sexual conduct (CSC-I), one count for Petitioner's penetration of the victim's vagina with his penis and one count for Petitioner's penetration of the victim's mouth with his penis.  The CSC-I statute identifies several circumstances where sexual penetration rises to the level of a first-degree offense.  The prosecutor relied on the following circumstance:

A person is guilty of criminal sexual conduct in the first degree if he or she engages in sexual penetration with another person and . . . [t]he actor causes personal injury to the victim and force or coercion is used to accomplish sexual penetration.

Mich. Comp. Laws § 750.520b.[2]

Petitioner's counsel requested that the jury also be instructed with regard to the elements of CSC-III.  (Trial Tr. II, ECF No. 21-6, PageID.859–860.)  There is a difference of only one element between the CSC-I circumstance argued by the prosecutor and one of the CSC-III

[2] The statute then proceeds to define force or coercion.  Mich. Comp. Laws § 750.520b(1)(f).

circumstances.  *Compare* Mich. Comp. Laws § 750.520b(1)(f) and Mich. Comp. Laws § 750.520d(1)(b).  If sexual penetration is accomplished by force or coercion, but the actor does not cause personal injury, the actor would be guilty of CSC-III rather than CSC-I.  The trial court instructed the jury regarding CSC-I, (Trial Tr. III, ECF No. 21-7, PageID.907–910), and CSC-III, (*Id.*, PageID.910), describing the latter offense as a "less serious," not "lesser included" offense.

The jurors apparently struggled with discerning the difference between CSC-I and CSC-III, because they sent the judge a note asking him to explain the difference.  (*Id.*, PageID.919.)  With the agreement of counsel, the judge brought the jury back in to the courtroom and reviewed the CSC-I and CSC-III instructions, highlighting that the difference between them was that CSC-III did not require proof of a resulting personal injury.  (*Id.*, PageID.919–923.)  A couple of hours later, the jurors returned their verdict: they found Petitioner guilty of CSC-III with regard to the penile/vaginal penetration and not guilty with regard to the penile/oral penetration or any of the CSC-I charges.

On September 28, 2012, the court sentenced Petitioner as described above.  (Sentencing Tr., ECF No. 21-8.)  Petitioner included the sentencing information report and the applicable sentencing grid as exhibits to his brief on direct appeal to the Michigan Court of Appeals.  (Sentencing Information Rep., ECF No. 21-12, PageID.1122; Sentencing Grid, ECF No. 21-12, PageID.1123.)  Petitioner reached the maximum point levels on the Offense Variables and the Prior Record Variables, yielding a minimum sentence range of 117 to 320 months.  (*Id.*)

Petitioner, with the assistance of counsel, directly appealed his conviction and sentence, raising two issues: a claim that the trial court improperly admitted hearsay evidence regarding out-of-court statements of the victim through the testimony of the sexual assault nurse

examiner (SANE); and a claim that the trial court had improperly scored certain offense variables. The first issue is now before this Court as habeas ground I.  The second direct appeal issue is a small part of habeas ground II.  By opinion issued November 21, 2013, the court of appeals rejected Petitioner's challenges and affirmed the trial court.  (Mich. Ct. App. Op., ECF No. 21-12, PageID.1073–1078.)

Petitioner then filed a *pro per* application for leave to appeal to the Michigan Supreme Court, raising the same issues he raised in the Michigan Court of Appeals.  (Pet'r's Appl. for Leave to Appeal, ECF No. 21-17, PageID.1329–1353.)  The Michigan Supreme Court denied leave to appeal, initially on May 27, 2014, (Mich. Order, ECF No. 21-17, PageID.1320) and then upon reconsideration on September 29, 2014, (Mich. Order, ECF No. 21-17, PageID.1321). Petitioner did not file a petition for certiorari in the United States Supreme Court.  (Am. Pet., ECF No. 10, PageID.132.)

At the same time Petitioner was pursuing his direct appeal with the assistance of counsel, he requested a new trial in the trial court by way of a *pro per* motion filed May 8, 2013. The motion raised one issue, Petitioner argued that instructing the jury on the elements of CSC-III was erroneous because CSC-III is not a lesser included offense of CSC-I.  On June 18, 2013, the trial court denied the motion as untimely.  (Shiawassee Cnty. Cir. Ct. Order, ECF No. 21-13, PageID.1199.)  Petitioner filed a claim of appeal from that order.  (Mich. Ct. App. Claim of Appeal, ECF No. 21-13, PageID.1198.)  The Michigan Court of Appeals dismissed the appeal because the trial court's order was not a final order subject to appeal as of right.  (Mich. Ct. App. Order, ECF No. 21-13, PageID.1196.)

7

Petitioner then filed an application for leave to appeal the trial court's denial of his motion for new trial.  In addition to arguing the merits, Petitioner argued that his motion was timely as measured from the trial court's entry of an amended judgment of sentence.[3]  On March 21, 2014, the court of appeals denied leave because the application lacked merit.  (Mich. Ct. App. Order, ECF No. 21-14, PageID.1211.)  It is not clear whether the lack of merit was attributable to the timeliness issue, the lesser-included offense issue, or both.

Petitioner then filed an application for leave to appeal to the Michigan Supreme Court.  That court denied leave by order entered September 5, 2014.  (Mich. Order, ECF No. 21-18, PageID.1418.)  Thus, the "lesser included offense" appeal was concluded before Petitioner's direct appeal.

Petitioner returned to the trial court, filing a motion for relief from judgment on October 20, 2015.  (Mot. for Relief from J., ECF No. 21-10.)  In his motion for relief from judgment, Petitioner raised the claims he now presents as habeas grounds IV–X in his amended petition.  The motion also raised an issue regarding the scoring of offense and prior record variables for sentencing; however, as set forth in detail below, it is ***not*** the same issue Petitioner raises as a federal constitutional issue in the amended petition as habeas ground II.

By opinion and order entered November 2, 2015, the trial court concluded that Petitioner had failed to demonstrate the ineffective assistance of appellate counsel; therefore,

---

[3] The trial court entered an amended judgment of sentence on November 8, 2012.  The initial judgment of sentence indicated that the CSC-III sentence was consecutive, but it did not indicate which of Petitioner's sentences it was consecutive to.  (Shiawassee Cnty. Cir. Ct. J., ECF No. 21-12, PageID.1088.)  The sentencing transcript indicates the CSC-III sentence would be consecutive to the sentence for which Petitioner was on parole at the time he committed the CSC-III offense.  (Sentencing Tr., ECF No. 21-8, PageID.970-971.)  The amended judgment of sentence added that information.  (Shiawassee Cnty. Cir. Ct. Am. J., ECF No. 21-14, PageID.1232.)

Petitioner had failed to show good cause for not raising his motion issues on direct appeal. (Shiawassee Cnty. Cir. Ct. Op. & Order, ECF No. 21-11, PageID.1071.)  The trial court also acknowledged that it could waive the good cause requirement where Petitioner showed he was actually innocent of the crime; but the court concluded that Petitioner had not made that showing. (*Id*.)

Even before the circuit court denied relief, Petitioner filed his first habeas petition in this Court. *Kares v. Trierweiler*, No. 1:15-cv-992 (W.D. Mich.) (*Kares I*).  The Court dismissed the petition on January 28, 2016, because Petitioner had not yet exhausted his state court remedies—he had not appealed the trial court's denial of his motion for relief from judgment to the Michigan Court of Appeals and the Michigan Supreme Court.  *Kares I* (Op., Order, & J., ECF Nos. 11, 12, 13.)

Petitioner then applied for leave to appeal the trial court's denial of his motion for relief from judgment to the Michigan Court of Appeals.  He raised the issues he raised in the trial court, and he changed his argument with regard to the offense and prior record variable scoring claims: he added a claim regarding judicial-fact-finding based on the line of cases beginning with *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and including *Ring v. Arizona*, 53 U.S. 584 (2002), *Blakely v. Washington*, 542 U.S. 296 (2004), *United States v. Booker*, 543 U.S. 220 (2005), and *Alleyne v. United States*, 570 U.S. 99 (2013).[4]  (Pet'r's Appl. for Leave to Appeal, ECF No. 21-15, PageID.1272–1275.)  That issue, as altered, is the issue he raises in this Court as habeas ground II.  Nonetheless, on September 27, 2016, the court of appeals denied relief "because [Petitioner]

---

[4] In fact, Petitioner had already changed the issue to include his "judicial fact-finding" claim when he filed his petition and amended petition in *Kares I*.  *Kares I* (Pet., ECF No. 1, PageID.27–29; Am. Pet., ECF No. 10, PageID.80.)  He just never presented the issue that way to the trial court.

failed to establish that the trial court erred in denying his motion for relief from judgment." (Mich. Ct. App. Order, ECF No. 21-15, PageID.1236.)

Petitioner then filed an application for leave to appeal to the Michigan Supreme Court raising the same issues he raised in the court of appeals. The supreme court denied relief by order entered December 27, 2017. (Mich. Order, ECF No. 21-19, PageID.1474.)

On February 9, 2018, Petitioner returned to the trial court again. This time he filed a motion under Mich. Comp. Laws § 770.16 asking the court to order testing of biological material. (Shiawassee Cnty. Cir. Ct. Docket Sheet, ECF No. 21-1, PageID.371; Pet'r's Mot. for Testing of Biological Material, ECF No. 21-16, PageID.1316–1318.) Specifically, Petitioner asked the court to order testing of the following: (1) items of evidence collected by the sexual assault nurse examiner that the contends had not been tested; and (2) multiple items of bedding from Petitioner's residence that had not been tested. (Pet'r's Mot., ECF No. 21-16, PageID.1317.) By order entered February 12, 2018, the trial court denied relief because Petitioner's motion did not address any of the three things Petitioner had to show under the statute to file the motion. (Shiawassee Cnty. Cir. Ct. Op. & Order, ECF No. 21-16, PageID.1313–1315.) Petitioner did not allege, much less show, that DNA testing was done—although it clearly was. Petitioner did not allege, much less show, that the results of the testing were inconclusive—they clearly were not. And Petitioner did not allege, much less show, that testing with current DNA technology was likely to yield conclusive results. Therefore, the court concluded, Petitioner failed to show that he qualified to even file such

a motion under the statute.  Petitioner's claim failed at the "first phase" of the two-phase proceeding contemplated by the statute.[5]

Petitioner filed an application for leave to appeal the trial court's order to the Michigan Court of Appeals.  That court denied leave by order entered August 29, 2018.  (Mich. Ct. App. Order, ECF No. 21-16, PageID.1300.)  Petitioner then filed an application for leave to appeal to the Michigan Supreme Court.  The supreme court denied leave by order entered April 2, 2019.  (Mich. Order, ECF No. 21-20, PageID.1533.)

Before the supreme court entered its order denying leave, Petitioner filed his petition in this Court.  (Pet., ECF No. 1.)  Petitioner raised the first ten of the eleven issues that appear in his amended petition.  After the Michigan Supreme Court denied relief on April 2, 2019, Petitioner sought leave to amend the petition to add his DNA testing issue.  (Pet'r's Mot. to Amend, ECF No. 8.)  The Court allowed Petitioner to amend his petition.  (Order, ECF No. 9.)  Petitioner filed his amended petition on May 28, 2019.

Based on the timeline through the Michigan Supreme Court's denial of leave to appeal on the motion for relief from judgment—or approximately that timeline[6]—upon conducting a preliminary review of the petition, the undersigned recommended dismissal of the petition as untimely.  (R. & R., ECF No. 11.)  Petitioner filed objections to that recommendation and, by way of those objections, informed the Court of the specifics regarding Petitioner's motion for testing

---

[5] Even though the court did not entertain Petitioner's motion, the court went on to note that even if Petitioner had addressed, and could satisfy, the requirements to file his motion, Petitioner had also failed to satisfy the showing necessary to compel testing.  (Shiawassee Cnty. Cir. Ct. Op. & Order, ECF No. 21-16, PageID.1315.)

[6] At the time of the preliminary review, the Court relied on Petitioner's recounting of the dates that the Michigan Supreme Court denied leave to appeal and the subsequent motion for reconsideration and the date that he had filed his motion for relief from judgment.  The state court record has clarified those dates.  They are slightly different than Petitioner's initial representations.

11

of biological material.  (Pet'r's Objs., ECF No. 12.)  Petitioner argued that the DNA testing motion tolled the period of limitation, thereby rendering his petition timely.

By order entered July 30, 2019, Chief Judge Jonker rejected the report and recommendation, in significant part because whether the DNA testing motion provided by Michigan statute tolled the habeas period of limitation was an issue of first impression.  The Court noted that there was a circuit split regarding whether similar statutes in other states tolled the period of limitation.  Therefore, the Court concluded, it could not be said that "'it plainly appear[ed] from the face of the petition . . . that the petitioner [was] not entitled to relief[.]'"  (Order, ECF No. 14, PageID.254) (quoting Rule 4, Rules Governing § 2254 Cases).  The Court determined that the parties should have an opportunity to litigate the statute of limitations issue on a more fully developed record.  The Court ordered Respondent to file an answer to the amended petition and Petitioner to file a reply.  The record is now fully developed.

## II.    The petition is untimely

Petitioner's application is barred by the one-year statute of limitations provided in 28 U.S.C. § 2244(d)(1), which became effective on April 24, 1996, as part of the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (AEDPA).   Section 2244(d)(1) provides:

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of

(A)    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B)    the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C)     the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D)     the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

In most cases, § 2244(d)(1)(A) provides the operative date from which the one-year limitations period is measured.  Under that provision, the one-year limitations period runs from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."  28 U.S.C. § 2244(d)(1)(A).  Petitioner appealed the judgment of conviction to the Michigan Court of Appeals and the Michigan Supreme Court.  The Michigan Supreme Court denied his application initially on May 27, 2014, (Mich. Order, ECF No. 21-17, PageID.1320) and then denied it upon reconsideration on September 29, 2014, (Mich. Order, ECF No. 21-17, PageID.1321).  Petitioner did not petition for certiorari to the United States Supreme Court.  (Am. Pet., ECF No. 10, PageID.132.)  The one-year limitations period, however, did not begin to run until the ninety-day period in which Petitioner could have sought review in the United States Supreme Court had expired.  *See Lawrence v. Florida*, 549 U.S. 327, 332–33 (2007); *Bronaugh v. Ohio*, 235 F.3d 280, 283 (6th Cir. 2000).  The ninety-day period expired on December 28, 2014.

Petitioner had one year, until December 28, 2015,[7] to file his habeas application. Petitioner filed his application on December 21, 2018.  Obviously, he filed more than one year after the period of limitations began to run.  Thus, absent tolling, his application is time-barred.

---

[7] The Court's analysis differs from that offered by Respondent by one day.  By Respondent's reckoning, Petitioner could have timely filed his petition on December 29, 2015.  By the Court's reckoning, that would be the 366th day and, thus, one day too late.

The running of the statute of limitations is tolled when "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending . . . ." 28 U.S.C. § 2244(d)(2); *see also Duncan v. Walker*, 533 U.S. 167, 181–82 (2001) (limiting the tolling provision to only State, and not Federal, processes); *Artuz v. Bennett*, 531 U.S. 4, 8 (2000) (defining "properly filed"). Petitioner filed a motion for relief from judgment in state court on October 20, 2015, (Pet'r's Mot. for Relief from J., ECF No. 21-10), when there were 69 days remaining in the limitations period. That motion tolled the limitations period for as long as it remained "pending" before the trial court and on appeal. *See Lawrence*, 549 U.S. at 332 (holding that § 2244(d)(2) tolls the statute of limitations from the filing of an application for state post-conviction or other collateral relief until a decision is issued by the state supreme court). The trial court denied the motion and Petitioner appealed that decision to both levels of the Michigan appellate courts. The Michigan Supreme Court finally denied leave to appeal on December 27, 2017. Consequently, the statute of limitations began to run again after that date and expired 69 days later, on Monday, March 6, 2018. Thus, even with the benefit of tolling under § 2244(d)(2) based on Petitioner's filing of the motion for relief from judgment and subsequent appeals, Petitioner's application is more than nine months late.

If, on the other hand, Petitioner's motion for testing of biological material is a "properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim[,]" then it was filed with 25 days remaining in the period of limitation and remained pending until after the petition was filed in this case.

Petitioner's motion to test biological material was filed pursuant to Mich. Comp. Laws § 770.16 which provides:

> [A] defendant convicted of a felony at trial on or after January 8, 2001 who establishes that all of the following apply may petition the circuit court to order

14

DNA testing of biological material identified during the investigation leading to his or her conviction, and for a new trial based on the results of that testing:

(a) That DNA testing was done in the case or under this act.

(b) That the results of the testing were inconclusive.

(c) That testing with current DNA technology is likely to result in conclusive results.

Mich. Comp. Laws § 770.16(1).  If Petitioner satisfies the requirements to file the motion, he is entitled to the testing if he:

(a) Presents prima facie proof that the evidence sought to be tested is material to the issue of the convicted person's identity as the perpetrator of, or accomplice to, the crime that resulted in the conviction.

(b) Establishes all of the following by clear and convincing evidence:

(i) A sample of identified biological material described in subsection (1) is available for DNA testing.

(ii) The identified biological material described in subsection (1) was not previously subjected to DNA testing or, if previously tested, will be subject to DNA testing technology that was not available when the defendant was convicted.

(iii) The identity of the defendant as the perpetrator of the crime was at issue during his or her trial.

Mich. Comp. Laws § 770.16(4).

If the court grants the petition to conduct testing, it must deny the motion for new trial if the results are inconclusive or show that the defendant is the source of the biological material.  Mich. Comp. Laws § 770.16(7).  If, on the other hand, the DNA testing shows that the defendant is not the source of the biological material, the court must appoint counsel and hold a hearing to determine if, by clear and convincing evidence, that only the perpetrator of the crime could be the source of the biological material, that the biological material was properly handled, and that the exclusion of the defendant as the source, balanced against the other evidence in the case, is sufficient to justify the grant of a new trial.  Mich. Comp. Laws § 770.16 (8).

The federal circuits have not uniformly decided that motions that seek post-conviction DNA testing toll the running of the habeas period of limitation. Some courts have concluded that a motion for DNA testing is in the nature of a discovery motion and, therefore, not a motion for review of the judgment. *Brown v. Secretary for Dep't of Corr.*, 530 F.3d 1335, 1337 (11th Cir. 2008) (court held that motion under rule that provided procedures for obtaining DNA testing involved "an application for discovery only"; to attack the conviction based on the results requires "institut[ion of] a proceeding under Florida's collateral attack rules . . . ."); *Woodward v. Cline*, 693 F.3d 1289, 1293 (10th Cir. 2012) (regarding the Kansas statute, the court stated: "In essence the motion was a request for discovery. Because it did not call for reexamination of the judgment . . . .") (footnote omitted); *Price v. Pierce*, 617 F.3d 947, 952–53 (7th Cir. 2010) (regarding the Illinois statute, the court stated: "[W]hen a defendant moves under [the statute] for forensic testing, the best that can happen is that the trial court grants the motion, the tests are performed, and the defendant receives the results. The defendant may choose to use the results of the DNA test in a *separate* post-conviction petition for relief claiming his or her actual innocence, but no hearing automatically follows.") (emphasis in original); *see also Alverto v. Obenland*, No. 3:19-cv-5212, 2020 WL 5077425, at *5 (W.D. Wash. May 7, 2020) ("The purpose of [the DNA testing statute] is 'to provide a means for a convicted person to obtain DNA evidence . . . that would support a petition for postconviction relief.' . . . As a motion for post-conviction DNA testing provides a means to seek post-conviction relief, it does not toll the limitations period."), *R. & R. adopted*, 2020 WL 5064215 (Aug. 27, 2020); *Kennedy v. Ryan*, No. CV-17-04300, 2018 WL 7570288, at *3 (D. Ariz. Sept. 18, 2018), *R. & R. adopted*, 2019 WL 1099801 (Mar. 8, 2019) *certificate of appealability den.*, 2019 WL 8269083 (9th Cir. Oct. 25, 2019) ("DNA testing [motions] pursuant to Ariz. Rev. Stat. § 13-4240 . . . do not have any statutory tolling effect because

16

[they] 'differ[] from a petition for postconviction relief under Rule 32 and its statutory counterparts.'"); *Brown v. Hunt*, No. 1:16cv160, 2017 WL 628463, at *2–3 (W.D.N.C. Feb. 15, 2017) *certificate of appealability den.*, 694 F. App'x 201 (4th Cir. 2017) ("Petitioner filed a motion for post-conviction DNA testing . . . [it] did not seek review of, or to vacate, his convictions and/or sentences. Instead [it] sought information that had the potential to help Petitioner develop challenges to his convictions and/or sentences."); *Rowe v. Giroux*, No. 3:13-cv-02444, 2015 WL 5997127 (M.D. Penn. Oct. 14, 2015)[8]; *Montgomery v. Turner*, No. 1:15-cv-00330, 2016 WL 11371451, at *13 (N.D. Ohio, Oct. 26, 2016) *R. & R. adopted*, 2016 WL 7437915 (Dec. 27, 2016) *certificate of appealability den.*, No. 17-3082 (6th Cir. Jul. 18, 2017) ("[S]ince his application for DNA testing amounted to a request for discovery, not an actual petition for post-conviction relief or for collateral review of his judgment, the undersigned finds the reasoning of the Seventh, Tenth, and Eleventh Circuits persuasive and concludes that Montgomery's application for DNA did not serve to toll the AEDPA statute of limitations."); *Werner v. Wall*, No. Civ.A. 06-31T, 2006 WL 2559484, at *3 (D.R.I. Aug. 31, 2006) ("Because the DNA Motion cannot be construed as a motion for post-conviction or collateral review, it also does not toll the statute of limitations for purposes of filing a § 2254 Motion in this federal court."); *Burton v. Runnels*, No. CIV S-02-0675, 2006 WL 1062097, at *5 n.12 (E.D. Cal. Apr. 21, 2016), *R. & R. adopted*, 2006 WL 2839254 (Sept. 29, 2006), *aff'd*, No. 06-17072, 2009 WL 580695 (9th Cir. Mar. 5, 2009) ("[P]etitioner filed a motion

---

[8] In *Rowe*, the magistrate judge issued a report and recommendation holding that DNA testing motions did not toll the habeas period of limitation. In resolving the petitioner's objections, the district court judge agreed with that proposition, but ultimately concluded that the motion at issue was not only a DNA testing motion, but also a separate motion under the Pennsylvania Post Conviction Relief Act (PCRA). The court concluded that a PCRA motion would toll the habeas period of limitation. When the case came back to the magistrate judge, she then considered whether the PCRA motion was "properly filed." She concluded that the PCRA motion was untimely and, therefore, not properly filed such that it could not toll the habeas period of limitation anyway. *Rowe v. Giroux*, No. 3:13-cv-02444, 2016 WL 3513401 (M.D. Pa. Jun. 1, 2016). The district court adopted that report and recommendation in its entirety. *Rowe v. Giroux*, No. 3:13-cv-02444, 2016 WL 3511544 (M.D. Pa. Jun. 27, 2016) *certificate of appealability den.*, No. 17-1650 (3d Cir. Jan. 11, 2018).

for DNA testing pursuant to Cal. Pen. Code § 1405 in the California Superior Court.  (Ex. H.)  This motion did not toll the statute of limitations.").

Courts interpreting other post-conviction statutory provisions for DNA testing motions have concluded that such motions properly toll the running of the period of limitation because the statutory provisions upon which they are based actually call for a review of the judgment.  *Hutson v. Quarterman*, 508 F.3d 236, 238–39 (5th Cir. 2007) (court held that Texas statute that provided for post-conviction DNA testing tolled the habeas period of limitation because, if the court found favorably to the prisoner regarding the likelihood that the prisoner would have been convicted had the new DNA results been available at trial, the court could release the prisoner on bail)[9]; *McDonald v. Smith*, No. 02-cv-6743, 2003 WL 22284131, at *6 (E.D.N.Y. Aug. 21, 2003), *aff'd on other grounds*, 134 F. App'x 466 (2d Cir. 2005) (court held that motions for DNA testing, which were provided for in the statute setting forth procedure for motions to vacate judgment, N.Y. Crim. Pro. § 440.30, "is akin to a section 440.10 motion to vacate, it is distinguishable from motions for discovery, which do not toll the limitation period."); *Jackson v. Hendricks*, No. Civ.A.04-2145, 2006 WL 1307655, at *7 (D.N.J. May 8, 2006 ) (court determined that PCR petition seeking DNA testing tolled the habeas period of limitation).

---

[9] The Fifth Circuit's holding in *Hutson* is suspect.  Three dissenting Justices in *Skinner v. Switzer*, 562 U.S. 521 (2011), concluded that the DNA testing statute may be part of Texas' collateral review procedures but it is not "an 'application for . . . collateral review' under 28 U.S.C. § 2244(d)(2)."  *Skinner*, 562 U.S. at 538 n.2 (the majority did not consider or take a position on that issue).  Moreover, the Texas courts have clearly concluded, despite *Hutson*, that the criminal procedure chapter that authorizes the court to order DNA testing authorizes that, and nothing more.  *Farrell v. Texas*, No. 09-15-00454, 2017 WL 1536186, at *3 (Tex. App. Apr. 26, 2017).  It does not permit the court to order a new trial; to obtain that relief, the prisoner must file a habeas corpus petition.  *Texas v. Holloway*, 360 S.W.3d 480, 485-490 (Tex. Crim. App. 2012), *overruled in part on other grounds by Whitfield v. Texas*, 430 S.W.3d 405, 409 (Tex. Crim. App. 2014).  The premise of the *Hutson* court's conclusion was that Texas courts consider motions under the post-conviction DNA testing statute to be like a habeas petition.  *Hutson*, 508 F.3d at 239 n.17.  That is clearly no longer the case.

These cases beg the question, is the motion Petitioner filed in the state court like a "discovery" motion or a "new trial" motion?  Section 770.16 plainly contemplates both types of relief, but the language of the statute also suggests that the relief is available in two separate stages. The statute provides:  "a defendant . . . may petition the circuit court to order DNA testing of biological material . . . ***and for a new trial based on the results of that testing*** . . . ."  Mich. Comp. Laws § 770.16 (emphasis added).  The Michigan courts have recognized that the statute contemplates two distinct procedural phases:

> MCL 770.16 envisions two main phases; the first phase involves the court assessing whether DNA testing should be ordered, and the second phase entails, if DNA testing was ordered, whether a motion for new trial should be granted.  Here, we are solely concerned with the first phase.  As indicated earlier, if a defendant satisfies the required factors with respect to the question whether DNA testing should be ordered, "[t]he court shall order DNA testing[.]"  MCL 770.16(4) (emphasis added).  Accordingly, it would be improper to deny DNA testing on the basis that a court concludes that it would deny a future motion for new trial regardless of the results of any DNA testing.  A court is not statutorily permitted to conflate the two phases of analysis.

*People v. Poole,* 874 N.W.2d 407, 414 (Mich. Ct. App. 2015).[10]

The motion Petitioner filed on February 9, 2018, seeks both types of relief:  an order for testing and a new trial based upon the results.  The two are not only distinct, per *Poole,* but also sequential.  The first step—the motion for testing—is simply not a collateral attack on the judgment.  It seeks only discovery and should not toll the running of the period of limitation.

---

[10] Respondent points out that even the first phase involves two distinct inquiries that serve different purposes:  the requirements of subparagraph 1 spell out preconditions to filing the motion; and the requirements of subparagraph 3 spell out the circumstances where the motion to test must be granted.  (Resp't Br., ECF No. 20, PageID.295–297.) Respondent then argues that the trial court denied Petitioner's motion because he failed to satisfy the preconditions and, thus, his motion was not "properly filed" and could not toll the running of the period of limitation.  Because the undersigned concludes that the motion could not toll the period of limitation even if it were "properly filed," I will not address Respondent's argument regarding proper filing.

The second step—the motion for new trial—is premature until testing is ordered. In fact, it does not appear that the motion for new trial contemplated by Mich. Comp. Laws § 770.16 is any different than any other such motion under Michigan Court Rule 6.431.  Under that rule, once the conviction is final—as was the case for Petitioner—the defendant must seek relief by way of a motion for relief from judgment under subchapter 6.500.  Mich. Ct. R. 6.431(A)(4).  Once the testing is ordered, even if the defendant must seek relief under subchapter 6.500, he is permitted to file even a successive motion, because the testing results would be "new evidence" under 6.502(G)(2).[11]  Until the testing is ordered, however, that part of the motion is not "properly filed."  Until Petitioner has new test results, he does not have new evidence to justify his filing of a successive petition.  For that reason, the undersigned concludes that Petitioner's request "for a new trial based upon the results of the testing of said biological material" cannot toll the running of the period of limitation as a properly filed collateral attack.

The motion Petitioner filed on February 9, 2018, whether considered as a motion for DNA testing or as a motion for new trial, was not a properly filed collateral attack.  For that reason, the motion did not toll the running of the period of limitation.  Accordingly, the petition was untimely and is properly dismissed.

Although not germane to the issue of timeliness, it is worthwhile to touch upon the merits of Petitioner's motion for DNA testing when considering what Petitioner has lost by virtue of the trial court's denial of the motion.  The SANE collected swabs, smears, wipes, and the victim's underwear.  (SANE Report Excerpt, ECF No. 21-16, PageID.1311.)  Forensic Scientist

---

[11] The Sixth Circuit Court of Appeals similarly considers new DNA test results as overcoming a bar to second or successive petitions. *In re Michael D. Harris*, No. 17-2603, p. 2 (6th Cir. May 24, 2018) ("The events giving rise to Harris's claims related to the DNA testing began in 2016 when he first obtained that testing.  Because he could not have presented those claims in a prior habeas petition, Harris is not required to obtain our authorization.").

Cassandra Campbell, of the Michigan State Police Crime Lab in Lansing, Michigan, tested the items that the SANE collected.  (Trial Tr. II, ECF No. 21-6, PageID.725–729.)  Ms. Campbell reported that all of the swabs (except the oral swabs), the anal and vaginal smears, and the undergarments tested positive for the presence of semen.  (*Id*.)  She took cuttings from the swabs labeled anal[12] and vaginal for further testing.  (*Id*.)  Forensic Scientist Lori Bruski tested the swab cuttings.  She identified genetic material from the victim and Petitioner in the cuttings.  Put simply, Petitioner's semen was found in the victim's vagina.

The items that Petitioner wants tested now are his own bedding and the materials collected by the SANE that were not DNA tested by Ms. Bruski (the victim's underwear and the other swabs—speculum, labial fold, and external).  Those materials collected by the SANE were tested, and tested positive for, the presence of sperm.  It is a reasonable inference that the sperm was Petitioner's.  But, even if the sperm were not Petitioner's, it would not detract one whit from the persuasive force of the testing that showed the sperm identified in the swabs taken from the victim's vaginal and anal area was Petitioner's.  Similarly, if Petitioner's bedding—part of which was taken from his dryer, not his bed—did not have the victim's DNA in it or did have Petitioner's DNA (whether from epithelial or sperm cells) in it, it would not tend to make any fact of significance to the determination of his guilt more or less likely.

Petitioner may be permitted to file a post-conviction motion for DNA testing, but the motion he filed is nothing more than a smokescreen.  The trial court denied Petitioner's motion

---

[12] There was some inconsistency between the SANE's report regarding the items collected and the lab's report regarding the items tested.  The nurse reported that she collected cervical, vaginal, oral, pubic area, and speculum swabs.  Ms. Campbell reported that she received and tested swabs labeled cervical, anal, oral, speculum, labial fold, and external.  Similarly, the nurse reported that she collected cervical and oral smears, but Ms. Campbell reported that she received and tested vaginal, anal, and oral smears.  Ms. Campbell also reported that each kit has three preprinted sleeves for the glass slides used for smears.  Those sleeves are labeled vaginal, anal, and oral.  Thus, it does not appear that the SANE report form checklist for smears matches the contents of the standard kit.

for DNA testing because it did not meet and could not meet any of the statutory requirements for relief.  But even apart from the statutory preconditions to filing, Petitioner's motion was utterly frivolous.

The pointlessness of Petitioner's motion for DNA testing is even more apparent when one considers that the trial court permitted Petitioner to hire his own expert to conduct DNA tests on the evidence and that Petitioner's expert conducted DNA tests on the evidence.  (Mot. Hr'g Tr., ECF No. 21-3, PageID.408–413; Hr'g Tr., ECF No. 21-4, PageID.426–428.)  Petitioner is aware of those results, but they are not part of the state court record, which suggests the results did not exculpate Petitioner in any way.

Petitioner's request for DNA testing is in the nature of a discovery motion; it is not the sort of collateral attack that warrants tolling under the statute.

## III.    Procedural default

Respondent argues that this Court's review of virtually all of Petitioner's habeas grounds is barred by the doctrine of procedural default.  There are two types of procedural default.  First, there is procedural default under state law.  When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991).  To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether (1) the petitioner failed to comply with an applicable state procedural rule, (2) the state court enforced the rule so as to bar the claim, and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim.  *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004).  In determining whether a state procedural rule was applied to bar a claim, a reviewing court looks to the last reasoned state-court

decision disposing of the claim.  *See Ylst*, 501 U.S. at 803; *Guilmette v. Howes*, 624 F.3d 286, 291–92 (6th Cir. 2010).

Second, there may be a procedural default if Petitioner has failed to raise a federal issue in the state courts.  Before the Court may grant habeas relief to a state prisoner, the prisoner must exhaust remedies available in the state courts.  28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).  Exhaustion requires a petitioner to "fairly present" federal claims so that state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon a petitioner's constitutional claim.  *Id.* at 844, 848; *see also Picard v. Connor*, 404 U.S. 270, 275–78 (1971); *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995); *Anderson v. Harless*, 459 U.S. 4, 6 (1982).

Failure to fairly present an issue to the state courts is only a problem if a state court remedy remains available for petitioner to pursue.  *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).  If no further state remedy is available to Petitioner, his failure to exhaust does not bar relief; but the claim may be procedurally defaulted.  *Gray v. Netherland,* 518 U.S. 152, 161–62 (1996).

If a petitioner procedurally defaulted his federal claim, the petitioner must demonstrate either (1) cause and prejudice—cause for his failure to comply with the state procedural rule (or fairly present the issue in the state courts) and actual prejudice flowing from the violation of federal law alleged in his claim—or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice.  *See House v. Bell*, 547 U.S. 518, 536 (2006); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986); *Hicks*, 377 F.3d at 551–52.  The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence.  *House*, 547 U.S. at 536–37.  A habeas petitioner asserting a claim of actual

innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

Respondent argues that Petitioner has procedurally defaulted habeas grounds I, II, V, VI, VII, VIII, and IX. The Court notes that there is also an argument that petitioner procedurally defaulted habeas ground III. To show cause sufficient to excuse a failure to raise claims, Petitioner must point to "some objective factor external to the defense" that prevented him from raising the claims. *Murray*, 477 U.S. at 488; *see McCleskey v. Zant*, 499 U.S. 467, 497 (1991). Factors that may establish cause include interference by officials, attorney error rising to the level of ineffective assistance of counsel, and a showing that the factual or legal basis for a claim was not reasonably available. *Cvijetinovic v. Eberlin*, 617 F.3d 833, 837 (6th Cir. 2010) (citing *Hargrave-Thomas v. Yukins*, 374 F.3d 383, 388 (6th Cir. 2004) (quoting *McCleskey*, 499 U.S. at 493–94) (quotations omitted)). For Petitioner's procedural defaults, he offers as "cause" the ineffective assistance of his trial or appellate counsel.

The showing necessary to establish ineffective assistance of counsel as "cause" is the same showing necessary to establish an independent claim of ineffective assistance of counsel: the petitioner must prove (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Strickland v. Washington,* 466 U.S. 668, 687 (1984). A court considering a claim of ineffective assistance "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91,

24

101 (1955)).  Even if a court determines that counsel's performance, in light of the circumstances as they existed at the time of counsel's action, was outside the wide range of reasonable professional assistance, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 690–91.

To determine whether counsel rendered ineffective assistance because he or she failed to raise a claim, therefore, necessarily involves some inquiry into the merits of the claim that counsel failed to raise.  There is simply no other way to assess the professional reasonableness of counsel's failure to raise the claim or the effect that failure had on the judgment.  Thus, it is often true that resolution of a procedural default claim necessarily involves consideration of the merits of the claim foregone.  At that point, it might well be easier to simply address the merits claim.

The Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits.  *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."); *see also Hudson v. Jones*, 351 F.3d 212, 215–16 (6th Cir. 2003) (citing *Lambrix* and *Nobles v. Johnson*, 127 F.3d 409, 423–24 (5th Cir. 1997)); *Overton v. MaCauley*, 822 F. App'x 341, 345 (6th Cir. 2020) ("Although procedural default often appears as a preliminary question, we may decide the merits first."); Where the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default.  *See Hudson*, 351 F.3d at 215–16; *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999) ("[T]he procedural default raises more questions than the case on the merits.  We will therefore assume without deciding that there was no procedural default by

petitioner and decide the merits of the case."); *Watkins v. Lafler*, 517 F. App'x 488, 498 (6th Cir. 2013) ("[T]he district court specifically noted that it chose not to address these [procedural default] arguments and rather assumed that no procedural default existed because "the procedural default issue raises more questions than the case on the merits.' . . . Given the variety and complexity of the defaults involved . . . we do likewise.").   For most of Respondent's claims of procedural default, it is simpler to resolve Petitioner's claims on the merits.  The undersigned has proceeded accordingly, with a couple of exceptions that are explained in detail below.

## IV.    AEDPA standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693–94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).  "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision."  *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011) quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)) (internal quotation marks omitted).  This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the holdings, and not the dicta, of the

Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Williams*, 529 U.S. at 381–82; *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002).  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts.  *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06).  "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity.  *Stermer*, 959 F.3d at 721.  "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."  *Yarborough*, 541 U.S. at 664.  "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims."  *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656.  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review.  The federal court is not free to consider any possible factual source.  The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).  "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits.  *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court 28 U.S.C. § 2254(d), AEDPA deference no longer applies."  *Stermer*, 959 F.3d at 721.  Then, the petitioner's claim is reviewed *de novo*.  *Id*. citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003).[13]

---

[13] Where the state court refused to consider the merits of a claim because of a procedural default, the undersigned concludes that such claims were never "adjudicated on merits" by the state court and, therefore, that *de novo* review applies.  Nonetheless, where the merits review rejecting Petitioner habeas grounds below is *de novo*, the same result would follow if the state courts had offered a merits decision or some analysis to which the Court might defer.

A.    **Petitioner was deprived of his right to equal protection when he was denied testing of forensic evidence (habeas issue XI)**

Because the DNA testing issue—the last listed of Petitioner's eleven habeas issues—was addressed in depth in resolving the statute of limitations question, the Court begins its merits discussion with this issue.  Petitioner offers little elaboration with regard to his equal protection argument.  He quotes the Equal Protection Clause, contends he met the requirements for testing under Mich. Comp. Laws § 770.16, notes that equal protection requires that similarly situated persons be treated alike, and concludes that his equal protection rights have been violated. (Pet'r's Br., ECF No. 10-1, PageID.207–208.)  Whether or not Petitioner's conclusory allegations state a claim for violation of his equal protection rights, the allegations do not state a claim that warrants habeas corpus relief.

Michigan's DNA testing statute is a form of postconviction remedy.  *See, e.g., Dist. Att'y's Office for the Third Judicial Dist. v. Osborne*, 557 U.S. 52, 67–69 (2009).  The states have no constitutional obligation to provide such postconviction remedies:

> Postconviction relief is even further removed from the criminal trial than is discretionary direct review.  It is not part of the criminal proceeding itself, and it is in fact considered to be civil in nature.  *See Fay v. Noia*, 372 U.S. 391, 423–424 (1963).  It is a collateral attack that normally occurs only after the defendant has failed to secure relief through direct review of his conviction.  States have no obligation to provide this avenue of relief, *cf. United States v. MacCollom*, 426 U.S. 317, 323 (1976) (plurality opinion) . . . .

*Pennsylvania v. Finley*, 481 U.S. 551, 556–57 (1987).  The Supreme Court has very specifically declined to recognize a free-standing constitutional right to access DNA evidence in the postconviction setting.  *Osborne*, 557 U.S. at 55–56; *see also Alley v. Key*, No. 06-5552, 2006 WL 1313364 (6th Cir. May 14, 2006) ("[W]e agree for purposes of the dispute now before us, with the district court's ruling that there exists no generally constitutional right to post-judgment DNA

testing.").  Therefore, Petitioner's right to DNA testing arises under the state statute, not the federal constitution.

Petitioner's claim that he is entitled to relief under Mich. Comp. Laws § 770.16 is a claim that the state erred in applying its own statute.  Such a claim is not cognizable on habeas review.  The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), whether or not a state court correctly applied its own law "is no part of the federal court's habeas review of a state conviction . . . [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."  *Id*. at 67–68.  The decision of the state courts on a state-law issue is binding on a federal court.  *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.").  The state court's decision that Petitioner was not entitled to postconviction DNA testing under the statute, therefore, is axiomatically correct on habeas review.

Although Petitioner and this Court are bound by the state court's determination that the statute does not entitle Petitioner to DNA testing, that does not rule out the possibility that the state has applied the statute to Petitioner in an unconstitutional way, for example, as Petitioner argues, that the state court has violated Petitioner's equal protection rights by applying the statute to him in a way that is inconsistent with the way the state has applied it to similarly situated persons.  Whether or not that claim has merit, however, it could not form the basis for habeas relief.

In *Kirby v. Dutton*, 794 F.2d 245 (6th Cir. 1986), the Sixth Circuit considered when errors in post-conviction proceedings were properly cognizable on habeas review. The court turned to *Preiser v. Rodriguez*, 411 U.S. 475 (1973), for guidance. In *Preiser*, three prisoners brought suit under 42 U.S.C. § 1983, claiming that they were unconstitutionally deprived of good-time credits following a guilty finding in disciplinary proceedings. The deprivation of the credits impacted the duration of each prisoner's sentence; restoration of credits, on the other hand, could result in immediate release. *Id*. at 476. The *Preiser* court held that habeas corpus was the exclusive mode of relief because an attack on the legality of custody that seeks release is the traditional function of a habeas writ.

The *Kirby* court considered how *Preiser*'s reasoning might apply to Sixth Amendment claims seeking the effective assistance of counsel and Fourteenth Amendment claims alleging denials of due process and equal protection would apply to post-conviction proceedings. Such claims, the court noted, were not directed at the proceeding where Petitioner was convicted and sentenced and thus, even if Kirby prevailed on his constitutional claims, the result would not be release or a reduction in time. *Kirby*, 794 F.2d at 247. The *Kirby* court concluded that *Preiser* precluded the grant of habeas relief for such claims. The *Kirby* court found support in cases from other circuits that also held "the writ is not the proper means by which prisoners should challenge errors or deficiencies in state post-conviction proceedings . . . because the claims address collateral matters and not the underlying state conviction giving rise to the prisoner's incarceration." *Id*.

The *Kirby* court recognized that "the result of the habeas petition need not necessarily be reversal of the conviction[; h]owever, the petition must directly dispute the fact or duration of confinement." *Id*. at 248. That the ultimate goal might be release from confinement

was not sufficient if "the result of the specific issues before [the court was] not in any way related to the confinement." *Id*.

The Sixth Circuit continues to validate the *Kirby* holding.  In *Cress v. Palmer*, 484 F.3d 844 (6th Cir. 2007), the court stated:

> [T]he Sixth Circuit has consistently held that errors in post-conviction proceedings are outside the scope of federal habeas corpus review. *See Kirby v. Dutton*, 794 F.2d 245, 246–47 (6th Cir. 1986); *Roe v. Baker*, 316 F.3d 557, 571 (6th Cir. 2002). We have clearly held that claims challenging state collateral post-conviction proceedings "cannot be brought under the federal habeas corpus provision, 28 U.S.C. § 2254," because "'the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody.'" *Kirby*, 794 F.2d at 246 (quoting *Preiser*[, 411 U.S. at 484]). . . . A due process claim related to collateral post-conviction proceedings, even if resolved in a petitioner's favor, would not "result [in] . . . release or a reduction in . . . time to be served or in any other way affect his detention because we would not be reviewing any matter directly pertaining to his detention." *Kirby*, 794 F.2d at 247.  "Though the *ultimate* goal in" a case alleging post-conviction error "is release from confinement, the result of habeas review of the specific issue[ ] . . . is not in any way related to the confinement." *Id*. at 248. Accordingly, we have held repeatedly that "the scope of the writ [does not] reach this second tier of complaints about deficiencies in state post-conviction proceedings," noting that "the writ is not the proper means" to challenge "collateral matters" as opposed to "the underlying state conviction giving rise to the prisoner's incarceration." *Id*. at 248, 247; *see also Alley v. Bell*, 307 F.3d 380, 387 (6th Cir. 2002) ("error committed during state post-conviction proceedings can not [sic] provide a basis for federal habeas relief" (citing *Kirby*, 794 F.2d at 247)); *Greer v. Mitchell*, 264 F.3d 663, 681 (6th Cir. 2001) ("habeas corpus cannot be used to mount challenges to a state's scheme of post-conviction relief").

*Cress*, 484 F.3d at 853 (emphasis in original).  More recently, when asked to revisit *Kirby*, the court of appeals stated that the petitioner "ha[d] not pointed to any decision by an *en banc* court or any Supreme Court decision to undermine the logic of *Kirby* . . . ." *Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 855 (6th Cir. 2017).

Petitioner's attack on the state court's rejection of his post-conviction request for DNA testing is likewise not cognizable on habeas review.  That claim does not seek immediate or quicker release from custody, it simply seeks a new hearing or perhaps DNA testing.  That relief

might be available in an action under 42 U.S.C. § 1983, but it is not available under 28 U.S.C. § 2254.  Accordingly, Petitioner's claim for the unconstitutional denial of DNA testing does not warrant habeas relief.

**B.    Petitioner was denied his constitutional right to due process and equal protection by the State of Michigan ruling "good cause" and "actual prejudice" were not demonstrated (habeas ground IV)**

Petitioner also contends that the state erred in application of its own postconviction remedy under Michigan Court Rule 6.500 et seq.  Because that claim is resolved by following the same analytical path as Petitioner's claim regarding DNA testing, it is appropriately considered next.

The State of Michigan provides a postconviction remedy under the Michigan Court Rules.  Once a prisoner's conviction is final, he may seek relief from judgment under Mich. Ct. R. 6.500 et seq.  Under Rule 6.502, the trial court must determine whether or not the prisoner raised the issue on direct appeal.  If he did, he is not entitled to relief.  If he did not, he may be permitted to obtain relief if he can show cause for the failure to raise the issue on direct appeal and prejudice.  Alternatively, the court may consider the issue despite a failure to raise it on direct appeal and a failure to show cause and prejudice if a prisoner demonstrates that he is actually innocent.

Petitioner contends that he has been denied due process and equal protection because the trial court erred when it concluded that Petitioner had failed to show cause and prejudice.  Petitioner has no freestanding right to the postconviction relief provided by the Michigan Court Rules.  The trial court's conclusion that Petitioner failed to show cause or prejudice is axiomatically correct.[14]

---

[14] There are parallel federal considerations of cause and prejudice that this Court applies when determining whether Petitioner can overcome the bar of a procedural default.  There is quite likely overlap in the meaning afforded to the terms "cause and prejudice" by the state court when interpreting Mich. Ct. R. 6.508(D)(3) and the federal courts when determining whether a procedural default bars federal habeas review.  Nonetheless, the meaning ascribed by the state

Even if the trial court's denial of relief on the motion for relief from judgment was somehow constitutionally infirm, that infirmity would not call into question Petitioner's conviction or sentence.  It would only entitle Petitioner to state court review of his post-conviction motion issues on the merits.  For the reasons stated in *Kirby* and *Cress*, correcting that sort of error is not the purpose of habeas review.  Petitioner's claim that the state court erred in resolving his motion for relief from judgment is not cognizable, and Petitioner is not entitled to relief.

**C.    Petitioner was denied his due process right to a fair trial by the admission of hearsay evidence over a defense objection (habeas ground I)**

The SANE, Alyssa Gilreath, testified regarding statements the victim made to her during the examination.  Petitioner contends he was denied a fair trial because the statements were inadmissible hearsay.

The Michigan Court of Appeals disagreed:

Defendant claims that the nurse's testimony was inadmissible hearsay, which affected the outcome of the trial.  "Hearsay evidence is inadmissible unless it fits within an exception to the hearsay rule."  *People v McDade*, 301 Mich App 343, 353; 836 NW2d 266 (2013).  One such exception is MRE 803(4), which excludes from the general hearsay rule "[s]tatements made for purposes of medical treatment or medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably necessary to such diagnosis and treatment."  In other words, "[s]tatements made for the purpose of medical treatment are admissible pursuant to MRE 803(4) if they were reasonably necessary for diagnosis and treatment and if the declarant had a self-interested motivation to be truthful in order to receive proper medical care."  *People v Mahone*, 294 Mich App 208, 214–215; 816 NW2d 436 (2011).

In the instant case, the sexual-assault nurse testified regarding her treatment of the victim soon after the assault, and the victim's report of the incident.  Defendant argues that the nurse's testimony should have been excluded as hearsay because it involved statements made for the purpose of collecting evidence in a criminal prosecution, not for medical treatment.  This argument is meritless for several reasons.  First, the nurse specifically testified that her primary duties were medical diagnosis and treatment, not the collection of evidence.  Moreover, only a

court to the words when applying the state rule and the meaning ascribed by the federal courts when conducting the procedural default analysis are distinct.

34

statement offered to prove the truth of the matter asserted is hearsay.  MRE 801(c).
Here, the testimony was offered to describe the process of the medical examination
and the routine gathering of information necessary for such an examination.  The
nurse refrained from even identifying defendant as the man the victim said raped
her.

Further, even if the nurse's testimony was hearsay, it was for the purpose of
medical treatment under MRE 803(4).  The victim's account of the sexual assault
was "reasonably necessary for diagnosis and treatment" because it determined the
type of examination and course of treatment that was most appropriate.  *Mahone*,
294 Mich App at 214–215.  Based on the victim's statements, the nurse conducted
a full body exam, gave her medications to prevent infections as well as pregnancy,
and detailed instructions for follow-up procedures for infections they could not
prevent and testing after the victim left the hospital.  As this Court has recognized,
a sexual assault can result in injuries that are not readily apparent, such as sexually
transmitted diseases or psychological injury, and "a victim's complete history and
a recitation of the totality of the circumstances of the assault are properly considered
to be statements made for medical treatment."  *Mahone*, 294 Mich App at 215; see
also *People v McElhaney*, 215 Mich App 269, 283; 545 NW2d 18 (1996) ("Sexual
abuse cases involve medical, physical, developmental, and psychological
components, all of which require diagnosis and treatment.").  The victim also had
a self-interested motivation to be truthful in order to receive the proper medical
care.  *Mahone*, 294 Mich App at 214–215.  Thus, the trial court did not err in
admitting the nurse's testimony.

(Mich. Ct. App. Op., ECF No. 21-12, PageID.1075.)

The extraordinary remedy of habeas corpus lies only for a violation of the

Constitution.  28 U.S.C. § 2254(a).  Whether evidence was properly admitted or improperly

excluded under state law "is no part of the federal court's habeas review of a state

conviction . . . [for] it is not the province of a federal habeas court to re-examine state-court

determinations on state-law questions."  *Estelle*, 502 U.S. at 67–68.  The decision of the state

courts on a state-law issue is binding on a federal court.  *See Wainwright*, 464 U.S. at 84 (1983);

*Bradshaw*, 546 U.S. at 76.  Thus, the state appellate court's determination that the testimony was

not hearsay conclusively resolves that issue.

"In conducting habeas review, a federal court is limited to deciding whether a

conviction violated the Constitution, laws, or treaties of the United States."  *Estelle*, 502 U.S. at

68.   "Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'"  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)).  This approach accords the state courts wide latitude in ruling on evidentiary matters.  *Seymour*, 224 F.3d at 552 (6th Cir. 2000).

Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently.  The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts.  *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000).  Petitioner has not met this difficult standard.

Even if the testimony at issue was "hearsay," Petitioner would not be entitled to relief based on that characterization alone.  As the Sixth Circuit has held, the Supreme Court has never recognized that the constitution is violated by the admission of unreliable hearsay evidence. *Desai v. Booker*, 732 F.3d 628, 630–31 (6th Cir. 2013).

Although hearsay *qua* hearsay is not constitutionally impermissible, hearsay does raise the specter of another issue:  violation of the Confrontation Clause.  The Confrontation Clause of the Sixth Amendment gives the accused the right "to be confronted with the witnesses against him."  U.S. Const., am. VI; *Pointer v. Texas*, 380 U.S. 400, 403–05 (1965) (applying the guarantee to the states through the Fourteenth Amendment).  "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990).

36

Reliability is ensured through entitling the accused to see the witnesses against him face-to-face, and to hear their testimony. *See Craig*, 497 U.S. at 846–47; *Coy v. Iowa*, 487 U.S. 1012, 1019–20 (1988).  Additionally, each witness must "'give his statements under oath–thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury.'"  *Lee v. Illinois*, 476 U.S. 530, 540 (1986).  The Confrontation Clause also permits the jury to observe the witnesses, enabling them to judge by their demeanor on the stand whether they are worthy of belief.  *See Mattox v. United States*, 156 U.S. 237, 242–43 (1895).

The very heart of the Confrontation Clause, however, is the right to cross-examine witnesses.  *See Ohio v. Roberts*, 448 U.S. 56, 63 (1980).  Cross-examination is the "greatest legal engine ever invented for the discovery of truth . . . ."  *California v. Green*, 399 U.S. 149, 158 (1970) (citation and internal quotes omitted).  The Confrontation Clause therefore prohibits the admission of an out-of-court testimonial statement at a criminal trial unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination.  *Crawford v. Washington*, 541 U.S. 36, 59 (2004).

The crux of Petitioner's complaint regarding Ms. Gilreath's hearsay testimony is that it ran afoul of *Crawford*.  (Pet'r's Mem. of Law, ECF No. 10-1, PageID.178–181.)  But it did not.

Although an out-of-court statement may not have been subject to any of these protections, it regains the lost protections if the declarant is present and testifying at trial.  *Green*, 399 U.S. at 158–61.  Further, an inability to cross-examine the witness at the time the out-of-court statement is made is not of crucial significance as long as the witness is subject to full and effective cross-examination at trial.  *Id.* at 159.  Similarly, the jury's inability to view the declarant's demeanor when the statement was made is not important when the jury may view that witness at

37

trial either affirming or disavowing the statement.  *Id.* at 160.  In other words, contemporaneous cross-examination before the jury is not so much more effective than subsequent examination at trial that it must be made the touchstone of the Confrontation Clause.  *Id.* at 161.  Thus, where the declarant testifies and is cross-examined, "our cases, if anything, support the conclusion that the admission of his [or her] out-of-court statements does not create a confrontation problem."  *Green*, 399 U.S. at 162; *see also United States v. Owens*, 484 U.S. 554, 560 (1988) (inquiry into the "indicia of reliability" or the "particularized guarantees of trustworthiness" of the out-of-court statements is not called for when the declarant is available at trial and subjected to unrestricted cross-examination, because "the traditional protections of the oath, cross-examination, and opportunity for the jury to observe the witness' demeanor satisfy the constitutional requirements").  The declarant—the victim—testified at trial, and Petitioner's counsel subjected her to unrestricted cross-examination.  Petitioner's Confrontation Clause argument, therefore, has no merit.

To the extent that Petitioner's constitutional challenge regarding hearsay was raised on direct appeal, Petitioner has failed to show that the state court's resolution is contrary to, or an unreasonable application of, clearly established federal law.  To the extent Petitioner's constitutional challenge was not raised on direct appeal, but was raised instead by way of his motion for relief from judgment, the claim fails on *de novo* review.

### D.    Trial court applied inaccurate information and engaged in judicial fact finding to increase Petitioner's sentence (habeas ground II)

Claims concerning the improper scoring of sentencing guidelines are state-law claims and typically are not cognizable in habeas corpus proceedings. *See Hutto v. Davis*, 454 U.S. 370, 373–74 (1982) (federal courts normally do not review a sentence for a term of years that falls within the limits prescribed by the state legislature); *Austin v. Jackson*, 213 F.3d 298, 301–02 (6th Cir. 2000) (alleged violation of state law with respect to sentencing is not subject to federal habeas

relief);  *Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999) (the sentencing guidelines establish only rules of state law).  There is no constitutional right to individualized sentencing. *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991); *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995); *see also Lockett v. Ohio*, 438 U.S. 586, 604–05 (1978).  Moreover, a criminal defendant has "no federal constitutional right to be sentenced within Michigan's guideline minimum sentence recommendations."  *Doyle v. Scutt*, 347 F. Supp. 2d 474, 485 (E.D. Mich. 2004); *accord Austin*, 213 F.3d at 301; *Lott v. Haas*, No. 17-2462, 2018 WL 2717052, at *1 (6th Cir. Apr. 10, 2018) (concluding that it is beyond reasonable debate that errors in applying sentencing guidelines do not state a claim for federal habeas relief).

Although state law errors generally are not reviewable in a federal habeas proceeding, an alleged violation of state law "could, potentially, 'be sufficiently egregious to amount to a denial of equal protection or of due process of law guaranteed by the Fourteenth Amendment.'"  *Bowling v. Parker*, 344 F.3d 487, 521 (6th Cir. 2003) (quoting *Pulley v. Harris*, 465 U.S. 37, 41 (1984)).  For example, a sentence may violate due process if it is based upon material "'misinformation of constitutional magnitude.'"  *Roberts v. United States,* 445 U.S. 552, 556 (1980) (quoting *United States v. Tucker,* 404 U.S. 443, 447 (1972)); *see also Townsend v. Burke,* 334 U.S. 736, 741 (1948).  Petitioner attempts to bring his sentence scoring challenges under the umbrella of habeas cognizability by claiming that the court relied upon inaccurate information when scoring the prior record and offense variables.

Additionally, a state "guidelines" sentence might violate the Sixth Amendment if judge-found-facts are used to score mandatory sentencing guidelines rather than facts that are found by the jury or admitted by the petitioner.  Petitioner also makes that claim with regard to the trial court's scoring of the prior record and offense variables.

Finally, Petitioner claims that his sentence violates due process because the court sentenced him based on factual findings that are inconsistent with the jury's verdict in that the jury acquitted him of the underlying conduct that the court used to score the guidelines.

Petitioner merges and mingles all four of these arguments—erroneous application of the guidelines, use of inaccurate information, use of judge-found facts, and use of acquitted conduct—into habeas ground II.  That part of his argument which is premised on the trial court applying the state statutory scoring guidelines incorrectly is purely a state law claim.  It is not cognizable on habeas review.  That is how Petitioner raised the argument on direct appeal.  That is also how the Michigan Court of Appeals resolved the claim.  (Mich. Ct. App. Op., ECF No. 21-12, PageID.1076–1078.)  The Court need not address it on habeas review.

Petitioner's other three arguments are addressed below.

### 1.  Judge-found facts

Petitioner bases his Sixth Amendment claim on a line of cases referenced above: *Apprendi*, 530 U.S. 466 (2000), *Ring*, 53 U.S. at 584, *Blakely*, 542 U.S. at 296, *Booker*, 543 U.S. at 220, and *Alleyne*, 570 U.S. at 99.  In *Apprendi*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  530 U.S. at 490.  *Apprendi* enunciated a new rule of Sixth Amendment jurisprudence.  In the subsequent case of *Blakely*, the Court applied the rule of *Apprendi* to a state sentencing-guideline scheme, under which the maximum penalty could be increased by judicial fact-finding.  The *Blakely* Court held that the state guideline scheme violated the Sixth and Fourteenth Amendments, reiterating the rule that any fact that increases the maximum sentence must be "admitted by the defendant or proved to a jury beyond a reasonable doubt."  *See Booker*, 543 U.S. at 232 (citing *Blakely*, 542 U.S. at 303).

40

Thereafter, in *Alleyne*, 570 U.S. 99, the Supreme Court held that the *Blakely* line of cases applies equally to mandatory minimum sentences.  In *People v. Lockridge*, 870 N.W.2d 502 (Mich. 2015), the Michigan Supreme Court held that, under *Alleyne*, the Michigan sentencing guidelines scheme violates the Sixth Amendment, because the "guidelines *require* judicial fact-finding beyond facts admitted by the defendant or found by the jury to score offense variables [] that *mandatorily* increase the floor of the guidelines minimum sentence range." *Lockridge*, 870 N.W.2d at 506 (emphasis in original).  The Court's remedy for the unconstitutionality of the Michigan guidelines was to sever and strike the mandatory component of the guidelines and make the guidelines advisory only.  *Id.* at 520–21 (relying on *Booker,* 543 U.S. at 264–265 (holding that the remedy for the unconstitutionality of the mandatory federal sentencing guidelines was to sever only the mandatory component, still requiring courts to consider the guidelines, but making them advisory and subject to review for reasonableness)).

On August 24, 2018, the Sixth Circuit agreed with the *Lockridge* analysis. *Robinson v. Woods*, 901 F.3d 710 (6th Cir. 2018).  The *Robinson* court held that the Supreme Court's decision in *Alleyne* clearly established that Michigan's mandatory minimum sentencing scheme was unconstitutional.  *Robinson*, 901 F.3d at 714.  The court reasoned that, "[]a]t bottom, Michigan's sentencing regime violated *Alleyne*'s prohibition on the use of judge-found facts to increase mandatory minimum sentences.  *Id.* at 716 (citing *Alleyne*, 570 U.S. at 111-12).

In the instant case, Petitioner was sentenced on September 29, 2012, before *Alleyne* was decided.  The *Alleyne* court was not writing on a blank slate.  More than 10 years earlier, the Supreme Court held that judicial factfinding that increases the mandatory minimum sentence for a crime is permissible under the Sixth Amendment.  *Harris v. United States*, 536 U.S. 545 (2002). Relying on *Harris*, as well as *Apprendi*, *Booker*, and *Blakely*, the Michigan Supreme Court

concluded that any guidelines sentence, even one based on facts and circumstances not proven to a jury beyond a reasonable doubt, was permissible under the Sixth Amendment, so long as it did not exceed the statutory maximum. *People v. Drohan*, 715 N.W.2d 778, 784–87 (2006). That was the state of the law when Petitioner was sentenced and when Petitioner filed his brief in the Michigan Court of Appeals.

Perhaps Petitioner could have raised the issue as a supplement before the court of appeals decided his case, but the effort would have been futile. That was the approach taken by criminal defendant Paul Herron. Herron's appeal was pending at the same time as Petitioner's. Herron filed a supplemental brief raising the *Alleyne* issue. *See* https://courts. michigan.gov/opinions_orders/case_search/pages/default.aspx?SearchType=1&CaseNumber=30 9320&CourtType_CaseNumber=2 (visited Jan. 22, 2021). The *Herron* court of appeals panel concluded that *Alleyne* did not apply to Michigan's sentencing guidelines which impacted only the minimum end of an indeterminate sentence and was entirely discretionary. *People v. Herron*, 845 N.W.2d 533 (Mich. Ct. App. 2013).

Moreover, the same panel that decided Petitioner's appeal—Judges Meter, Servitto, and Riordan—concluded *Alleyne* did not alter the holding in *Drohan*, just five days after that panel decided Petitioner's appeal. *See People v. Wilcox*, No. 310550, 2013 WL 6182633, at *4–5 (Mich. Ct. App. Nov. 26, 2013). Perhaps because of those decisions, Petitioner chose not to include the *Alleyne* issue in his *pro per* application for leave to appeal to the Michigan Supreme Court.

*Lockridge* was decided during the summer of 2015. Petitioner's judgment was final before the Michigan Supreme Court decided *Lockridge*; therefore, the *Lockridge* decision did not apply to him directly and afford him a remedy. *People v. Richards*, 891 N.W.2d 911, 924 (Mich. Ct. App. 2016), *rev'd, in part, on other grounds* 903 N.W.2d 555 (Mich. 2017) (court held that

*Lockridge* applies retroactively to cases pending on direct review when *Lockridge* was issued on July 29, 2015.  But *Lockridge* overruled *Drohan*, opening the door to application of *Alleyne* to Michigan sentencing guidelines minimums that became final after *Alleyne*, but before *Lockridge*. Thus, Petitioner was still free to argue that *Alleyne* rendered judicial fact-finding in support of scoring the sentencing guidelines unconstitutional in his case.  And *Alleyne* applied to Petitioner because his case was still pending on direct review when the *Alleyne* opinion was issued. *Robinson*, 901 F.3d at 714–15 ("And Supreme Court opinions apply to all criminal cases pending on direct review, no matter how much of a departure the decision represents from prior caselaw.") (citing *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987)).

That is the argument he makes in this Court.  At least on the surface, it is a compelling one.  There is little question the trial court impermissibly relied on judge-found facts to score some of the variables when determining Petitioner's minimum sentence guidelines range.

Petitioner also made that argument when he filed applications for leave to appeal the denial of his motion for relief from judgment in the Michigan Court of Appeals and the Michigan Supreme Court.  But he never made the argument in the trial court.

As noted above, before the Court may grant habeas relief to a state prisoner, the prisoner must exhaust remedies available in the state courts.  28 U.S.C. § 2254(b)(1); *O'Sullivan*, 526 U.S. at 842.  Exhaustion requires a petitioner to "fairly present" federal claims so that state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon a petitioner's constitutional claim.  *Id.* at 844, 848; *see also Picard*, 404 U.S. at 275–77 (1971); *Duncan*, 513 U.S. at 365; *Anderson*, 459 U.S. at 6.  "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  *O'Sullivan*, 526 U.S. at 845.  Petitioner did not.

43

Moreover, fair presentation has a substantive component and a procedural
component.  With regard to substance, fair presentation is achieved by presenting the asserted
claims in a constitutional context through citation to the Constitution, federal decisions using
constitutional analysis, or state decisions which employ constitutional analysis in a similar fact
pattern.  *Levine v. Torvik*, 986 F. 2d 1506, 1516 (6th Cir. 1993); *see also Picard*, 404 U.S. at 277–
78.  With regard to procedure, "[t]he fair presentation requirement is not satisfied when a claim is
presented in a state court in a procedurally inappropriate manner that renders consideration of its
merits unlikely."  *Black v. Ashley*, No. 95-6184, 1996 WL 266421, at *1 (6th Cir. May 17, 1996)
(citing *Castille v. Peoples*, 489 U.S. 346, 351 (1998) ("[W]here the claim has been presented for
the first and only time in a procedural context in which its merits will not be considered unless
'there are special and important reasons therefor,' . . . does not, for the relevant purpose, constitute
'fair presentation.'")); *see also Long v. Sparkman*, No. 95-5827, 1996 WL 196263, at *2
(6th Cir. Apr. 22, 1996); *Fuller v. McAninch*, No. 95-4312, 1996 WL 469156, at *2 (6th Cir. Aug.
16, 1996).

When Petitioner presented the *Alleyne* issue to the Michigan Court of Appeals and
the Michigan Supreme Court, he was presenting it for the first time in an application for
discretionary review.  When a conviction is on direct review, presentation of an issue for the first
time on discretionary review to the state supreme court does not fulfill the requirement of "fair
presentation."  *Castille*, 489 U.S. at 351.  Applying *Castille*, the Sixth Circuit repeatedly has
recognized that a habeas petitioner does not comply with the exhaustion requirement when he fails
to raise a claim in the state court of appeals but raises it for the first time on discretionary appeal
to the state's highest court.  *See Skinner v. McLemore*, 425 F. App'x 491, 494 (6th Cir. 2011);
*Thompson v. Bell*, 580 F.3d 423, 438 (6th Cir. 2009); *Warlick v. Romanowski*, 367 F. App'x 634,

643 (6th Cir. 2010); *Granger v. Hurt*, 215 F. App'x 485, 491 (6th Cir. 2007); *Dunbar v. Pitcher*, No. 98-2068, 2000 WL 179026, at *1 (6th Cir. Feb. 9, 2000); *Miller v. Parker*, No. 99-5007, 1999 WL 1282436, at *2 (6th Cir. Dec. 27, 1999); *Troutman v. Turner*, No. 95-3597, 1995 WL 728182, at *2 (6th Cir. Dec. 7, 1995); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990); *accord Parkhurst v. Shillinger*, 128 F.3d 1366, 1368-70 (10th Cir. 1997); *Ellman v. Davis*, 42 F.3d 144, 148 (2d Cir. 1994); *Cruz v. Warden of Dwight Corr. Ctr.*, 907 F.2d 665, 669 (7th Cir. 1990); *but see Ashbaugh v. Gundy*, 244 F. App'x 715, 717 (6th Cir. 2007) (declining to reach question of whether a claim raised for the first time in an application for leave to appeal to the Michigan Supreme Court is exhausted). Unless the state supreme court actually grants leave to appeal and reviews the issue, it remains unexhausted in the state courts.

The same reasoning applies on collateral review, but the application is broader because review is discretionary at both levels of Michigan's appellate system. When the court of appeals denied leave "because defendant failed to establish that the trial court erred in denying his motion for relief from judgment" (Mich. Ct. App. Order, ECF No. 21-15, PageID.1236), the court could only speak with regard to the issues Petitioner had raised in the trial court. Unless the court of appeals granted leave to appeal and reviewed Petitioner's *Alleyne* issue, it remained unexhausted. Of course, the same is true with regard to Petitioner's presentation of the issue to the Michigan Supreme Court. Thus, Petitioner has not fairly presented his *Alleyne* issue to any level of the Michigan court system.

Failure to fairly present an issue to the state courts is only a problem if a state court remedy remains available for petitioner to pursue. *Rust,* 17 F.3d at 16. If no further state remedy is available to Petitioner, his failure to exhaust does not bar relief; but the claim may be procedurally defaulted. *Gray,* 518 U.S. at 161–62.

45

Petitioner no longer has a state court remedy to pursue with regard to his *Alleyne* claim. Michigan Court Rule 6.502(G) permits one, and only one, motion for relief from judgment. Petitioner may file a second such motion "based on a retroactive change in law that occurred after the first motion for relief from judgment or a claim of new evidence that was not discovered before the first such motion." Mich. Ct. R. 6.502(G)(2). Petitioner's *Alleyne* argument does not rely on a retroactive change in law that occurred after his first motion or new evidence discovered after his first motion. The bar to successive motions for relief from judgment, therefore, "acts as an adequate and independent state ground for denying review sufficient to procedurally default a claim." *Ingram v. Prelesnik*, 730 F. App'x 304, 311 (6th Cir. 2018).

If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either cause and prejudice or a miscarriage of justice—that he is actually innocent.[15] Petitioner has not even attempted to explain his failure to raise the *Alleyne* issue in his first motion for relief from judgment.[16] Where a petitioner fails to show cause, the court need not consider whether he has established prejudice. *See Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982); *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985).

Petitioner has also not shown that he is actually innocent of CSC-III. He offers no new evidence that would make it more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt. For the reasons set forth above, even the new DNA evidence he seeks to obtain offers no hope of that result, no matter what the new test results might show.

---

[15] *See* § III, *infra*.

[16] Petitioner's circumstance is not the same as the circumstance of the petitioner in *Chase v. MaCauley*, 971 F.3d 582 (6th Cir. 2020). In *Chase*, the petitioner procedurally defaulted his *Alleyne* claim because counsel failed to raise it on direct appeal. The Sixth Circuit explained in detail why counsel's failure to raise the issue might be considered ineffective assistance even before *Lockridge* was decided. The default in Petitioner's case is his failure to raise the claim in his motion for relief from judgment. That failure cannot be attributed to counsel.

Because of Petitioner's procedural default, consideration of his *Alleyne* claims on habeas review is barred.

### 2.  Guidelines scored based on acquitted conduct

Petitioner claims that the trial court violated his due process rights by scoring the guidelines based on conduct that, according to the jury's verdicts of acquittal on both CSC-I charges and the CSC-III charge based on penile/oral penetration, did not happen.  Petitioner mentions the "acquitted conduct claim with regard to Offense Variables 3, 8, 10, 11, and 13. (Pet'r's Br., ECF No. 10-1, PageID.182–186.)[17]

### a.    Offense Variable 3

Petitioner raises an interesting point with regard to the scoring of Offense Variable 3.  Offense Variable 3 requires the court to assign points based on physical injury to the victim.  Mich. Comp. Laws § 777.33.  The court assigned Petitioner 10 points on Offense Variable 3, which corresponds to a determination that "[b]odily injury requiring medical treatment occurred to a victim."  Mich. Comp. Laws § 777.33(1)(d).  The Michigan Court of Appeals concluded that the scoring found support in the record:

> The sexual-assault nurse reported a half-millimeter tear near the victim's anus, which could have been from forced sexual contact.  Further, the victim was given medication to prevent or diminish the impact of infection, such as sexually transmitted diseases that may have been introduced during the sexual assault.  In light of the fact that such treatment was considered necessary by the medical staff, we do not find that the trial court plainly erred in finding that a score of 10 points for bodily injury requiring medical attention was warranted

(Mich. Ct. App. Op., ECF No. 21-12, PageID.1078.)  Petitioner does not contest the appellate court's conclusion regarding the evidence.  Instead, he contends that the jury's verdict compels the conclusion that the jury found there was no bodily injury.

---

[17] Petitioner did not mention the "acquitted conduct" issue with regard to the scoring of Prior Record Variable 7 or Offense Variable 19.  (Pet'r's Br., ECF No. 10-1, PageID.182–186.)

Logic supports Petitioner's conclusion that the jury did not find, beyond a reasonable doubt, that Petitioner caused physical injury to the victim by virtue of the penile/vaginal penetration.  If the jury had found, beyond a reasonable doubt, that Petitioner had caused such injury, the jury would have found Petitioner guilty of CSC-I, not CSC-III.  Because the jury found Petitioner guilty of CSC-III and not guilty of CSC-I, it necessarily follows that the jury acquitted Petitioner of causing physical injury by way of the coerced penile/vaginal penetration, or at least could not reach unanimity on that issue.

The Michigan Supreme Court has concluded that scoring based on acquitted conduct violates due process:

> When a jury has made no findings (as with uncharged conduct, for example), no constitutional impediment prevents a sentencing court from punishing the defendant as if he engaged in that conduct using a preponderance-of-the-evidence standard.  But when a jury has specifically determined that the prosecution has not proven beyond a reasonable doubt that a defendant engaged in certain conduct, the defendant continues to be presumed innocent.  "To allow the trial court to use at sentencing an essential element of a greater offense as an aggravating factor, when the presumption of innocence was not, at trial, overcome as to this element, is fundamentally inconsistent with the presumption of innocence itself." *Marley*, 321 N.C. at 425, 364 S.E.2d 133.
>
> Unlike the uncharged conduct in *McMillan*, conduct that is protected by the presumption of innocence may not be evaluated using the preponderance-of-the-evidence standard without violating due process.

*People v. Beck*, 939 N.W.2d 213, 225 (Mich. 2019) (footnotes omitted).[18]  The Michigan Supreme Court, however, is not the arbiter of clearly established federal law.

---

[18] Petitioner's direct appeal, and the denial of his motion for relief from judgment, were final before the Michigan Supreme Court decided *Beck*.  Prior to *Beck*, the Michigan Supreme Court's most definitive statement regarding the use of "acquitted conduct" for sentencing appeared in *People v. Ewing (After Rem.)*, 458 N.W.2d 880 (Mich. 1990).  There were three substantive opinions in *Ewing*.  The *Beck* majority described the *Ewing* decision as "a fractured set of opinions in which it is not entirely clear what rule of law commanded a majority."  *Beck*, 939 N.W.2d at 220.  Nonetheless, three justices "blessed the practice of sentencing courts relying on acquitted conduct as long as it was proven by a preponderance of the evidence."  *Id.*  And another justice stated "that 'the mere fact of a prior acquittal of charges whose underlying facts are properly made known to the trial judge is not, without more, sufficient reason to preclude the judge from taking those facts into account at sentencing.'"  *Id.*  Thus, it would not be unfair to characterize *Beck* as "a new rule for the conduct of criminal prosecutions."  *See People v. Amerson*, No. 345215, 2020 WL 4557739, at *2 n.3 (Mich. Ct. App. Aug. 6, 2020).

In *United States v. Watts*, 519 U.S. 148 (1997), the Supreme Court held "that a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." *Id*. at 157. Based on *Watts*, therefore, **not** finding beyond a reasonable doubt that Petitioner caused physical injury is different than finding beyond a reasonable doubt that he did not cause physical injury. Petitioner attempts to assign the significance of the latter finding to the former determination.

It is difficult to reconcile the *Watts* holding with the Michigan Supreme Court's conclusion in *Beck*. The *Beck* majority thought so as well: "*Watts* is in many ways the most difficult to dispense with, and also the most difficult to parse." *Beck*, 939 N.W.2d at 224. The Michigan Supreme Court attempted to cabin the *Watts* holding by describing the question before the Supreme Court in *Watts* as "only a double jeopardy challenge to the use of acquitted conduct." *Id*. By so limiting *Watts*, the Michigan Supreme Court concluded that *Watts* did not require rejection of the "argument that the use of acquitted conduct to sentence a defendant more harshly violates due process . . . ." *Id*. (footnote omitted). As far as the Michigan Supreme Court was concerned, it addressed that issue "on a clean slate." *Id*. at 225 (footnote omitted).

In the end, for purposes of habeas review, the conflict between the Michigan Supreme Court's holding in *Beck* and the Supreme Court's holding in *Watts*, at least as applied to Offense Variable 3, proves to be nothing more than an interesting point. *Watts* is clearly established law. To the extent that the Michigan courts followed *Watts* when considering acquitted conduct relating to physical injury, that determination was not contrary to, or an unreasonable application of, clearly established federal law. But careful examination of the record reveals that

the Michigan courts were never called upon to consider this question because Petitioner never raised it in the state courts.

Petitioner did not challenge the scoring of Offense Variable 3 in his motion for relief from judgment (Mot. for Relief from J., ECF No. 21-10, PageID.1018–1022), or in his subsequent applications for leave to appeal to the Michigan Court of Appeals (Appl. for Leave to Appeal, ECF No. 21-15, PageID.1272–1275) or the Michigan Supreme Court (Appl. for Leave to Appeal, ECF No. 21-19, PageID.1507–1511).  Petitioner challenged the scoring of Offense Variable 3 on direct appeal (Appeal Br., ECF No. 21-12, PageID.1112–1114), but he did not challenge the scoring on this ground.  In fact, Petitioner specifically acknowledged in his brief that the difference in the burden of proof standard for the determination of guilt and sentencing purposes rendered the verdict of acquittal "not determinative" with regard to sentencing.  (*Id.*, PagerID.1114.)

For the reasons set forth above with regard to Petitioner's *Alleyne* argument, with regard to Offense Variable 3, Petitioner's "acquitted conduct" argument is also unexhausted, and now procedurally defaulted.  Petitioner no longer has a remedy to pursue because he failed to raise the acquitted conduct issue in his first motion for relief from judgment.  He has not established cause for that failure.  He has not established actual innocence of CSC-III.  Accordingly, his procedural default bars this Court's consideration of the issue.

### b.    Offense Variables 8, 10, and 13

In his habeas brief, Petitioner raises the "acquitted conduct" issue with regard to Offense Variable 8, Offense Variable 10, Offense Variable 11, and Offense Variable 13.  With the exception of Offense Variable 11, he does not really explain how the "acquitted conduct" issue applies.  Also, with the exception of Offense Variable 11, he did not exhaust his "acquitted conduct" claims in the state courts.

Offense Variable 8 requires the court to assign 15 points where a victim was asported to another place of greater danger. Mich. Comp. Laws § 777.38. The court assigned a score of 15 points because Petitioner lured the victim to his apartment by promising payment for a job—cleaning a saddle. Moreover, once she was there, he lured her into his bedroom with some pretense regarding identifying a pair of sweatpants. There is nothing in the jury's verdicts of acquittal or guilt that speaks to the issue of asportation. There is no inconsistency between the verdicts and the court's score of Offense Variable 8. Petitioner's argument is groundless.

Moreover, Petitioner did not challenge the scoring of Offense Variable 8 in his motion for relief from judgment. Petitioner challenged the scoring of Offense Variable 8 on direct appeal, but he questioned the court's application of the guideline to the facts, not that the court's finding was based on acquitted conduct. The court of appeals concluded the variable was properly scored. (Mich. Ct. App. Op., ECF No. 21-12, PageID.1076–1077.)

Offense Variable 10 requires the court to assign points based upon whether or not the perpetrator exploited a vulnerable victim. Mich. Comp. Laws § 777.40. Petitioner did not contest the initially proposed scoring of the variable at 10 points because that score was consistent with a determination that Petitioner exploited the victim's youth. Mich. Comp. Laws § 777.40(1)(b); (Appeal Br., ECF No. 21-12, PageID.1116.) In fact, Petitioner suggested that a score of 10 points would be consistent with the verdict. (*Id*.) ("[G]iven the verdict, ten points could likely be scored under OV 10 for exploitation of the victim's youth."). Petitioner objected, however, when the trial court bumped the score up to 15 points for predatory conduct. The court of appeals concluded that the variable was properly scored. (Mich. Ct. App. Op., ECF No. 21-12, PageID.1077–1078.)

Petitioner did not challenge the scoring of Offense Variable 10 in his motion for relief from judgment.  He challenged the scoring only on direct appeal and only on the ground that the court misapplied the guideline, not because it involved "acquitted conduct."  The court of appeals concluded that the offense variable was properly scored.  (Mich. Ct. App. Op., ECF No. 21-12, PageID.1077–1078.)

Offense Variable 13 requires the court to assign a score based upon how the sentencing offense fits into a pattern of criminal behavior.  Mich. Comp. Laws § 777.43.  The court scored Petitioner 10 points because the CSC-III offense was "part of a pattern of felonious criminal activity involving a combination of 3 or more crimes against a person or property . . . ."  Mich. Comp. Laws § 777.43(1)(d).  The section considers all crimes within a 5-year period, regardless of whether the offense resulted in a conviction.  Mich. Comp. Laws § 777.43(2)(a).  The sentencing transcript does not support Petitioner's suggestion that the trial court relied on any of the CSC offenses other than the sentencing offense.  (Sentencing Tr., ECF No. 21-8, PageID.944–947.)

Petitioner did not raise a challenge to the scoring of this variable on direct appeal. He questioned the scoring in his motion for relief from judgment; but he did not complain that the scoring was based on acquitted conduct, he complained that he was only initially charged with two crimes and two crimes would not suffice to show a pattern of three crimes.  (Mot. for Relief from J., ECF No. 21-10, PageID.1020–1021.)[19]  Petitioner modified his challenge on appeal to the Michigan Court of Appeals, but he changed it to an *Alleyne* challenge, not an "acquitted conduct" challenge.  (Appl. for Leave to Appeal, ECF No. 21-15, PageID.1273–1274.)  Petitioner modified his challenge again on appeal to the Michigan Supreme Court.  (Appl. for Leave to Appeal, ECF

---

[19] Petitioner's argument appears to be founded on the misconception that the pattern at issue when scoring Offense Variable 13 must be present in the criminal proceeding that includes the sentencing offense.  That is plainly not the case.

No. 2119, PageID.1510.)  It is difficult to discern exactly what Petitioner was arguing to the Michigan Supreme Court.  Perhaps it was, in part, an *Alleyne* challenge and, in part, a claim that the court erroneously applied the guideline.  In any event, it was not an "acquitted conduct" challenge.

With regard to Offense Variables 8, 10, and 13, therefore, Petitioner never exhausted his "acquitted conduct" claims in the Michigan courts.  He no longer has a remedy there.  He has failed to show cause for his failure to raise the "acquitted conduct" claims on direct appeal or in his motion for relief from judgment, and he has failed to demonstrate that he is actually innocent of the CSC-III crime of which he was convicted.  Accordingly, Petitioner's procedural default precludes the Court's consideration of these "acquitted conduct" claims.

### c.    Offense Variable 11

Offense Variable 11 requires the court to assign points based upon the number of sexual penetrations that occurred.  Mich. Comp. Laws § 777.41.  One criminal sexual penetration warrants the assignment of 25 points, two or more, 50 points.  The one penetration that forms the basis of a first- or third-degree criminal sexual conduct offense is not scored.

The trial court scored 25 points for Offense Variable 11.  (Sentencing Information Rep., ECF No. 21-12, PageID.1122.)  Petitioner posits that the court must have scored as the second penetration the charged penile/oral penetration.  Because Petitioner was acquitted of that penetration, Petitioner contends he was denied due process at sentencing.

There is no discussion of the Offense Variable 11 scoring in the sentencing transcript.  Petitioner assumes that the scored second penetration was the "acquitted conduct." That is not necessarily true.  Although only two penetrations were charged, the testimony indicated there were at least three penetrations.  In addition to the charged penile/oral and penile/vaginal penetrations, the victim testified to a digital/vaginal penetration.  She reported that Petitioner

ordered her to remove her clothes and lie down on the bed.  He spread her legs, and then spread her labia with his fingers.  "Any penetration, no matter how slight, is sufficient to satisfy the 'penetration' element . . . ."  *People v. Hunt*, 501 N.W.2d 151, 154 (Mich. 1993).  "*[A]ny* intrusion, however slight, into the vagina *or* the labia majora" will suffice.  *People v. Lockett*, 814 N.W.2d 295, 307 (Mich. Ct. App. Jan. 10, 2012) (emphasis in original).  Thus, it is not at all apparent on the record before the Court that Petitioner was scored based on "acquitted conduct."

Moreover, even if the trial court scored the penile/oral penetration as the second penetration, there was ample evidence in the record to support such a finding by a preponderance of the evidence based on the testimony of the victim.  Thus, scoring the penile/oral penetration is not contrary to, or an unreasonable application of, *Watts*, the clearly established federal law regarding consideration of "acquitted conduct" at sentencing.

### 3.  Guidelines variables scored based on inaccurate information

Petitioner also contends that his sentence violates due process because it was based on false or inaccurate information.  To prevail on such a claim, the petitioner must show (1) that the information before the sentencing court was materially false, and (2) that the court relied on the false information in imposing the sentence.  *United States v. Polselli,* 747 F.2d 356, 358 (6th Cir. 1984).  In *Tucker*, the Supreme Court was concerned about the sentencing court's reliance on misinformation where the court gave "explicit attention" to it, "found[ed]" its sentence "at least in part" on it, or gave "specific consideration" to the information before imposing sentence. *Tucker*, 404 U.S. at 447.

Petitioner raises all of, or at least some subset of, his amalgam of erroneous application/judge-found facts/acquitted conduct/inaccurate information challenges for each of the seven sentencing guidelines variables he contests.  Upon review of his arguments, however, it is apparent that the inaccurate information challenge does not apply to Prior Record Variable 7

(Pet'r's Br., ECF No. 10-1, PageID.183), Offense Variable 3 (*Id.*, PageID.183–184), Offense Variable 8 (*Id.*, PageID.184), Offense Variable 10 (*Id.*), Offense Variable 11 (*Id.*, PageID.185), and Offense Variable 13 (*Id.*).  That leaves Offense Variable 19.

Offense Variable 19 requires the court to assign points for interference with the administration of justice.  The court assigned 15 points (Sentencing Information Report, ECF No. 21-12, PageID.1122), which is appropriate where "[t]he offender used force or the threat of force against another person . . . to interfere with, or attempt to interfere with . . . the administration of justice . . . ."  Mich. Comp. Laws § 777.49(b).  The prosecutor offered several possible justifications for scoring the variable, but the court rested its decision on Petitioner's threat to the victim that if she told anyone about the incident he would distribute the nude photographs he took of her.  (Sentencing Tr., ECF No. 21-8, PageID.947–953.)

Petitioner argues:

> The trial court engaged in judicial fact-finding to apply information to increase the sentence being imposed.  The information applied here is inaccurate and is contradictory to the testimony of Detective Carson who stated Mr. Kares was calm, cool, and cooperative.  (Ts. II, pg. 256).

(Pet'r's Br., ECF No. 10-1, PageID.185–186.)  Apparently, Petitioner believes that the court scored this variable as it did because Petitioner was somehow uncooperative when the police interviewed Petitioner.  Petitioner is plainly wrong.  He has failed to point to any false or inaccurate information that prompted the trial to score 15 points for Offense Variable 19.  Therefore, he is not entitled to habeas relief on his "inaccurate information at sentencing" habeas claim.

### E.    Petitioner was denied his due process rights by the trial court giving an improper lesser offense instruction (habeas ground III)

Petitioner next complains that the trial court erred because it instructed the jury regarding CSC-III.  Petitioner's argument suggests that the court so instructed the jury because the court believed that CSC-III was a lesser-included offense of CSC-I.

Typically, a claim that a trial court gave an improper jury instruction is not cognizable on habeas review.  Instead, Petitioner must show that the erroneous instruction so infected the entire trial that the resulting conviction violates due process.  *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *see also Estelle*, 502 U.S. at 75 (erroneous jury instructions may not serve as the basis for habeas relief unless they have so infused the trial with unfairness as to deny due process of law); *Rashad v. Lafler*, 675 F.3d 564, 569 (6th Cir. 2012) (same); *Sanders*, 221 F.3d at 860 (same).  If Petitioner fails to meet this burden, he fails to show that the jury instructions were contrary to federal law.

Petitioner's objection to the giving of a lesser-included offense instruction is not typical.  It is far more common for a criminal defendant to argue that his due process rights were violated because the court refused to give a lesser-included offense instruction.  In *Keeble v. United States*, 412 U.S. 205 (1973) the Supreme Court identified why lesser-included offense instructions can operate to the benefit of a criminal defendant:

> [I]t is no answer to petitioner's demand for a jury instruction on a lesser offense to argue that a defendant may be better off without such an instruction. True, if the prosecution has not established beyond a reasonable doubt every element of the offense charged, and if no lesser offense instruction is offered, the jury must, as a theoretical matter, return a verdict of acquittal.  But a defendant is entitled to a lesser offense instruction—in this context or any other—precisely because he should not be exposed to the substantial risk that the jury's practice will diverge from theory.  Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction.  In the case before us, for example, an intent to commit serious bodily injury is a necessary element of the crime with which petitioner was charged, but not of the crime of simple assault.  Since the nature of petitioner's intent was very much in dispute at trial, the jury could rationally have convicted him of simple assault if that option had been presented.  But the jury was presented with only two options: convicting the defendant of assault with intent to commit great bodily injury, or acquitting him outright.  We cannot say that the availability of a third option—convicting the defendant of simple assault—could not have resulted in a different verdict.

*Keeble*, 412 U.S. at 212–13.  The Supreme Court described this as "providing the jury with the 'third option' of convicting on a lesser included offense [which] ensures that the jury will accord the defendant the full benefit of the reasonable-doubt standard."  *Beck v. Alabama*, 427 U.S. 625, 634 (1980).

Although the *Keeble* Court identified the potential benefit of a lesser-included offense instruction, the court did not protect that interest through the Due Process Clause.  The Due Process Clause requires providing lesser included offense instructions in **capital** cases.  *Beck v. Alabama*, 447 U.S. at 637–38.  Lesser-included offense instructions were also required in **noncapital** cases under the English common law and they are still required under the common law or by statute in every state and in the federal courts, if and when the evidence supports it.  *Id.* at 633–634, 636 n.n.11, 12.  Even though the courts of this nation are in complete accord as to the propriety of lesser included offense instructions, the Supreme Court has never held that lesser included offense instructions are required as a matter of constitutional due process in noncapital cases.  *Id.* at 638 n. 14; *see also Bagby v. Sowders*, 894 F.2d 792, 797 (6th Cir. 1990) (en banc) ("[The failure to instruct on lesser included offenses in noncapital cases [is not] such a fundamental defect as inherently results in a miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure[.]").

Petitioner's challenge suggests he would have preferred the "all or nothing option."[20] At least that is what he says now.  At trial, however, he, through counsel, was the one

---

[20] *See, e.g., Kelly v. Lazaroff*, 846 F.3d 819, 830–31 (6th Cir. 2017) ("Kelly argues that his trial counsel's decision to pursue an 'all-or-nothing' defense falls below the level of professionally competent assistance. . . .Trial counsel certainly pursued a "high risk, high reward" approach to [petitioner's] representation.  That approach had significant risks, including the possibility that Kelly would ultimately be convicted and face a lengthy prison sentence.  But it also carried potential reward, including the possibility that Kelly could avoid imprisonment entirely.  It cannot be the case that every risky trial strategy, upon failing, amounts to constitutionally ineffective counsel.  Because there was sufficient evidence in the record to support trial counsel's decision to pursue an 'all-or-nothing' defense, trial counsel's performance did not fall below the bar of professionally competent assistance.").

who requested the CSC-III instruction.  (Trial Tr. II, ECF No. 21-6, PageID.852, 859–861.)  He wanted to give the jurors the "third option."  *Beck v. Alabama*, 427 U.S. at 634.

The court and defense counsel agreed that CSC-III was not a necessarily lesser-included offense of CSC-I.  (*Id.*, PageID.859–860.)  But the prosecutor did not object to instructing the jury on CSC-III. (*Id.*, PageID.860.)  When the court referred to CSC-III in the instructions, he did not refer to it as a lesser-included offense, he referred to it as a less serious offense.

Where a criminal defendant is charged with a crime that has different degrees, the State of Michigan, by statute, permits the jury to "find the accused not guilty of the offense in the degree charged" but instead to "find the accused . . . guilty of a degree of that offense inferior to that charged . . . ."  Mich. Comp. Laws § 768.32(1).  In *People v. Cornell*, 646 N.W.2d 127, 139 (2002), the Michigan Supreme Court concluded that an offense is inferior to the charged offense if the charged "greater" offense requires the jury to find a disputed factual element that is not part of the "lesser included" offense.  An important characteristic of a lesser included offense is that it does not require the prosecutor to prove facts that the prosecutor is not required to prove with regard to the greater offense.  The importance of that characteristic derives from the constitutional requirement of notice:  if every element of the lesser offense is an element of the greater offense, notice of the greater offense necessarily gives the accused notice that he will have to defend against the elements of the lesser offense.  *Id*. at 138.  If the inferior offense included an element that was not required in the greater offense—a circumstance that would render the inferior offense a "cognate" lesser offense, rather than an "included" lesser offense[21]—to instruct on that offense over defense objection would implicate the due process requirement of notice, *id*. at 138–40, as

---

[21] The Supreme Court touched upon the difference in the context of jury instructions in *Hopkins v. Reeves*, 524 U.S. 88, 96 n.6 (1998).

well as the prosecutor's prerogative to determine what charge or charges to bring, *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978).

CSC-III is not, categorically, a lesser-included offense of CSC-I.  The CSC-I statute defines multiple circumstances that would render a sexual penetration a first-degree crime.  Mich. Comp. Laws § 750.520b.  Likewise, the CSC-III statute defines multiple circumstances that would render a sexual penetration a third-degree crime.  Mich. Comp. Laws § 750.520d.  Each set of circumstances that constitutes a CSC-III does not necessarily line up as a lesser-included set of circumstances of a CSC-I crime.  Nonetheless, the proposed CSC-III charge against Petitioner, Mich. Comp. Laws § 750.520d(1)(b), corresponds to the CSC-I charge, Mich. Comp. Laws § 750.520b(1)(f), with only one differentiating factor, the latter requires proof of personal injury to the victim.  Thus, a CSC-III charge based on the set of circumstances described in 1(b) is a lesser-included offense of a CSC-I charge based on the set of circumstances described in 1(f).  *People v. Clark*, No. 320007, 2015 WL 4546501 (Mich. Ct. App. Jul. 28, 2015).[22]  Therefore, the reading of the CSC-III instruction was proper.

Moreover, even if the instruction were somehow inappropriate, Petitioner could not obtain habeas relief because he invited the error.  In *Fields v. Bagley*, 275 F.3d 478 (6th Cir. 2001), the court explained the doctrine of invited error as follows:

> The doctrine of "invited error" is a branch of the doctrine of waiver in which courts prevent a party from inducing an erroneous ruling and later seeking to profit from the legal consequences of having the ruling set aside.  *Harvis v. Roadway Express, Inc.*, 923 F.2d 59, 61 (6th Cir.1991).  When a petitioner invites an error in the trial court, he is precluded from seeking habeas corpus relief for that error.  *See*

---

[22] There are several instances where the Michigan courts have concluded that another particular CSC-III charge is a lesser-included offense to a particular CSC-I charge.  *See, e.g., People v. Fabela*, No. 337365, 2018 WL 3129694 (Mich. Ct. App. Jun. 26, 2018); *People v. Smith*, No. 328642, 2016 WL 6992690 (Mich. Ct. App. Nov. 29, 2016); *People v. Kalmbach*, No. 317978, 2015 WL 248732 (Mich. Ct. App. Jan. 20, 2015); *People v. Ridley*, No. 303251, 2012 WL 2362427 (Mich. Ct. App. Jun. 21, 2012).

*Leverett v. Spears*, 877 F.2d 921, 924 (11th Cir. 1989); *Draughn v. Jabe*, 803 F.
Supp. 70, 75 (E.D. Mich. 1992).

*Fields*, 275 F.3d at 485–86.  The court was not inclined to read the instruction and the prosecutor

took no position.  The only reason the jury was instructed regarding CSC-III is because Petitioner

asked for it.  The invited error doctrine, therefore, precludes habeas relief on the jury instruction

issue.[23]

**F.    Petitioner was denied a fair trial by the prosecutor misrepresenting DNA
evidence to the jury (habeas ground V)**

Petitioner next argues that his trial was rendered unfair by improper comments from

the prosecutor regarding the nature of the DNA evidence.  The scope of review for prosecutorial

misconduct claims is narrow.  A petitioner must do more than show erroneous conduct.  "The

relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to

make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181

(1986) (quoting *Donnelly v. De Christoforo*, 416 U.S. 637, 643 (1974)).  "[T]he touchstone of due-

process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the

culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

In evaluating the impact of the prosecutor's misconduct, a court must consider the

extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner,

whether it was isolated or extensive, and whether the claimed misconduct was deliberate or

accidental.  *See United States v. Young*, 470 U.S. 1, 11–12 (1985).  The court also must consider

the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel

---

[23]The United States District Court for the Eastern District of Michigan has concluded that "[i]nvited error may be
overcome when the request for the instruction amounts to constitutionally ineffective assistance of counsel." *Coleman
v. Harry*, No. 07-15172, 2009 WL 3805611, at *13 n.1 (E.D. Mich. Nov. 10, 2009) (citing *Turner v. Calderon*, 970
F. Supp. 781, 805 (E.D. Cal. 1997) and *Patterson v. Dahm*, 769 F.Supp. 1103, 1106 (D. Neb. 1991)).  Whether
counsel's request for the instruction amounts to ineffective assistance is discussed below.

and whether a curative instruction was given by the court.  *See id.* at 12–13; *Darden*, 477 U.S. at

181–82; *Donnelly*, 416 U.S. at 646–47; *Berger v. United States*, 295 U.S. 78, 84–85 (1935).  "[A]

prosecutor's comments violate the defendant's right to due process only if, ***in context***, they

'undermine[d] the fundamental fairness of the trial and contribute[d] to a miscarriage of justice.'"

*Winowiecki v. Gidley*, No. 20-1461, 2020 WL 6743472, at *2 (6th Cir. Sept. 8, 2020) (quoting

*Young*, 470 U.S. at 16) (emphasis added); *see also United States v. McQuarrie*, 817 F. App'x 63,

81 (6th Cir. 2020) ("[C]ontext is key . . . .").

   A prosecutor is not limited to simply recounting the evidence during closing

argument.  He may also argue reasonable inferences from the evidence.  *Byrd v. Collins*, 209 F.3d

486, 535 (6th Cir. 2000); *see also Young*, 470 U.S. at 8 n.5 (acknowledging as a useful guideline

the American Bar Association Standard:  "The prosecutor may argue all reasonable inferences

from the evidence.").  Nonetheless, it is unquestionably improper for a prosecutor to argue facts

not in evidence.  *Abela v. Martin*, 380 F.3d 915, 929 (6th Cir. 2004) (citing *Berger*, 295 U.S. at

78).

   The "misrepresentations" of which Petitioner complains are the prosecutor's

references to the DNA evidence as "collected from the victim's vaginal and anal area."  (Pet'r's

Br., ECF No. 10-1, PageID.195.)  Petitioner claims that, by way of that misrepresentation, "a

critical element of the offense was improperly established, sexual penetration."  (*Id.*)

   As noted above, there were inconsistencies between how the SANE recorded the

items she collected from the victim in the SANE report and how items collected were labeled in

the kit.  Petitioner seizes upon those inconsistencies to claim that the prosecutor misrepresented

the DNA evidence.  He argues that because the SANE report does not have a check mark indicating

collection of an anal swab that no swab was collected and because the SANE report does not have a check mark indicating creation of a vaginal smear, no vaginal smear was created.

Petitioner suggests that the SANE testified that she did not collect those items, but that is not what she said.  She testified: "I did not document a swab from the anal area."  (Trial Tr. II, ECF No. 21-6, PageID.685.)  She never testified that she did not collect a swab from the anal area.  Similarly, the SANE never testified that she did not create a vaginal smear.  Cassandra Campbell testified that she tested the items from the kit labeled as anal and vaginal smears for the presence of sperm cells to confirm her initial results showing that the cervical swabs, anal swabs, speculum swabs, labial fold swabs, external swabs, and undergarments tested positive for the presence of semen.  (Trial Tr. II, ECF No. 21-6, PageID.725–729.)

There are no glaring inconsistencies between the testimony of the SANE and the contents of the kit as tested by Cassandra Campbell.  There are inconsistencies between the SANE report indicating which swabs and smears were collected and the contents of the kit.  The prosecutor urged the jurors to infer that the report was in error.  Petitioner's counsel urged the jurors to infer that the contents of the kit were in error, thereby creating reasonable doubt that precluded conviction.  Were those reasonable inferences or did the prosecutor and defense counsel argue facts not in evidence?

In *Coleman v. Jackson*, 566 U.S. 650 (2012), the Supreme Court provided guidance "in determining what distinguishes a reasoned inference from 'mere speculation.'"  *Id*. at 655.  The Court described a reasonable inference as an inference that a rational jury could make from the facts.  Certainly, the inferences urged by the prosecutor rationally flow from the identified facts.  They are not compelled by those facts.  The inferences are not even more likely than not.  They are simply rational.  *Id.* at 656.  To succeed in his challenge, therefore, Petitioner must show that

the inferences urged by the prosecutor are irrational.  He has not made, and cannot make, that showing.

Under the circumstances, the prosecution's references to the anal and vaginal swabs as having been collected from the victim is entirely consistent with how they were labeled in the kit, even if that is not consistent with the identification in the SANE report of the items collected. Moreover, it is not inconsistent with testimony of the SANE, who indicated only that she did not document the collection on the report.  Petitioner's conclusion that the SANE did not collect an anal swab or create a vaginal smear is not invalid, it is just not the only conclusion one can draw from the evidence.

Whether or not the inference invited by the prosecutor was strong, it was reasonable on its face.  Moreover, Petitioner's contention that the invited inference rendered his trial unfair because it established penetration is not accurate.  The victim did not testify that Petitioner penetrated her anus with his penis.  The prosecutor did not charge Petitioner with penile/anal penetration.  The SANE did not testify that she collected semen from the anal area in a way that necessarily would evidence the fact of penetration.

The swabs tested for DNA that were generally referenced as vaginal were, according to the DNA expert, the cervical swabs.  Certainly, presence of Petitioner's DNA in the cervical area strongly suggests penetration; but there were no inconsistencies between the SANE report and the kit with regard to the cervical swabs.  So, even if one accepted Petitioner's invited inference with regard to the anal swabs—that the inconsistency gives rise to reasonable doubt— that would not render unreasonable the allegedly invited inference that Petitioner's DNA on the cervical swabs evidences penetration, an inference that is particularly reasonable because the victim testified that the Petitioner penetrated her vagina with his penis.

Petitioner has failed to demonstrate that the prosecutor's arguments with regard to the DNA evidence rise to the level of prosecutorial misconduct that denied him due process. Accordingly, he is not entitled to habeas relief on this claim.

### G.    Petitioner was denied his due process rights by the prosecutor suppressing exculpatory evidence in its possession  (habeas ground VI)

Petitioner next complains that the prosecutor suppressed favorable evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  Under *Brady*, "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady*, 373 U.S. at 87.  The Supreme Court has held that "[t]here are three components of a true *Brady* violation:  [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).  Prejudice (and materiality) is established by showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Id.* at 280 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)); *see also Cone v. Bell*, 556 U.S. 449, 469–70 (2009).  A reasonable probability is "'a probability sufficient to undermine confidence in the outcome.'"  *Bagley*, 473 U.S. at 682 (quoting *Strickland*, 466 U.S. at 694.).

However, the *Brady* rule "only applies to evidence that was known to the prosecution, but unknown to the defense, at the time of trial."  *Apanovitch v. Houk*, 466 F.3d 460, 474 (6th Cir. 2006).  The government's failure to disclose potentially exculpatory evidence does not violate *Brady* "where a defendant 'knew or should have known the essential facts permitting him to take advantage of any exculpatory information,' *United States v. Grossman*, 843 F.2d 78,

85 (2d Cir. 1988) . . . , or where the evidence is available to defendant from another source." *United States v. Clark*, 928 F.2d 733, 738 (6th Cir. 1991). "[I]n such cases there is really nothing for the government to disclose." *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998).

Petitioner complains that the prosecutor suppressed "the bedding that was seized from his residence" and "the toxicology report from the victim." (Pet'r's Br., ECF No. 10-1, PageID.196.) With regard to the bedding, Petitioner argues that it "would establish that Mr. Kares did not change the sheets to tamper with evidence and that the sexual assault did not transpire." (*Id.*) With regard to the toxicology report, Petitioner argues "when dealing with a case of this nature, the possibility of the complainant/victim being under the influence of controlled substances is not only relevant, but highly favorable to the defense." (*Id.*, PageID.197.) Petitioner's claims are absurd. He has failed to show that he is entitled to relief at any of the three levels of a *Brady* claim: he has not shown that the prosecutor suppressed any evidence, he has not shown that the evidence was favorable, and he has not shown that he suffered any prejudice.

### 1.      The bedding

The victim described Petitioner's bedding to the police. The sheets on the bed when the deputy arrived, however, did not match the victim's description. The sheets in the dryer did. The deputy took Petitioner's sheets, with his permission. (Trial Tr. II, ECF No. 21-6, PageID.708, 822–823.) The sheets were not suppressed. They also were not tested. (*Id.*, PageID.708.) Thus, the prosecutor did not suppress any test results from the sheets either.

Petitioner's argument appears to be that the prosecutor's failure to test the sheets constitutes suppression. That is simply wrong. Neither the police nor the prosecutor "have a constitutional duty to perform any particular tests." *Arizona v. Youngblood*, 488 U.S. 51, 59 (1988).

Moreover, even if there were tests, what could the tests possibly show that would be "favorable"?  The sheets that the victim said were on the bed when she was assaulted were in the dryer.  If the sheets had the victim's DNA on them, that fact would not help Petitioner.  If the sheets did not have the victim's DNA on them it would not help Petitioner either because those sheets had been laundered.  If the sheets that were on the bed when the deputy arrived had Petitioner's DNA on them, it would not help Petitioner.  If they did not, it would not help Petitioner either because, according to the victim, those sheets were not on the bed during the assault.  If Petitioner's DNA were on the sheets or not on the sheets would be immaterial as well.  There is simply no scenario—no possible outcome of testing—that would have any influence on the outcome of the proceeding.

Petitioner has failed to demonstrate that the prosecutor violated *Brady* with regard to his bedding.  He is not entitled to habeas relief on that claim.

### 2.  Toxicology report

Petitioner's arguments regarding toxicology testing of the victim's urine is similar to his argument regarding the bedding.  The SANE reported that she collected a urine sample "to check both for infection of blood as well as previous pregnancy prior to giving her any medication."  (Trial Tr. II, ECF No. 21-6, PageID.676.)  There is nothing in the record to suggest that the urine was tested for the presence of controlled substances.  There was no obligation for the prosecutor to test urine if, in fact, any remained after the SANE obtained the information necessary to provide medical treatment.  *Youngblood*, 488 U.S. at 59.  If there is no such report, there was nothing for the prosecutor to suppress.  Moreover, Petitioner does not claim that he did not know that the urine was collected.  If any remained, he could have sought testing.

Petitioner claims that a toxicology report would have been "highly favorable," but he does not explain why.  The victim spoke with the deputy that night, shortly after the assault.

66

She was examined by the nurse that night.  Both testified.  Neither suggested the victim was under the influence of controlled substances.  Petitioner was with the victim that night.  He did not suggest that she was under the influence of controlled substances.  Even if there were a toxicology report, and even if it showed the presence of controlled substances, it is not clear how that would favor Petitioner.  Moreover, without knowing that a toxicology report actually showed the presence of controlled substances, Petitioner cannot demonstrate prejudice.

Petitioner has, again, failed to demonstrate that the prosecutor violated *Brady* with regard to the non-existent toxicology report.  He is not entitled to habeas relief on that claim.

### H. Petitioner was denied his due process right to a fair trial by the prosecution failing to produce endorsed res gestae witnesses at trial (habeas ground VII)

Petitioner next contends that the prosecution violated his due process rights by failing to produce *res gestae* witnesses Kimberly Lowry and Samantha Black.  Petitioner attaches to his amended petition an April 9, 2012, an amended witness list from the prosecutor that indicates that the prosecutor intended to produce Lowry and Black at trial.  (Witness List, ECF No. 10-2, PageID.228.)  By the first day of trial, however, it was apparent that the parties knew Kimberly Lowry would not be called because she was not included on the list of prospective witnesses read to the jury.  (Trial Tr. I, ECF No. 21-5, PageID.450–451.)  Petitioner did not object.

Petitioner contends that the testimony of Kimberly Lowry was important to the defense because she admitted that the victim had knowledge of what is necessary to falsify allegations of being sexually assaulted.  As with most of Petitioner's contentions, that is quite a reach.  Kimberly Lowry was the victim's mother and Petitioner's girlfriend.  The "favorable-to-the-defense" statement upon which Petitioner relies is somewhere in the investigating deputy's interview of Ms. Lowry:

Q:    So you believe she's never had sex before?

A:     I do not believe she's ever had sex before.

Q:     The fact that [the victim] told you this is extra disturbing because she's not interested in men.

A:     Correct.

Q:     And when she told you this story, you knew that there had to be some validity to it because she's just not interested in men.

A:     Correct.  And my, my daughter would never make an accusation like that. She's had friends that have done it and has, has been blown away by it. Like, how could you accuse somebody if it really didn't happen.  That ruins people's lives.  And that, those are her words.  She would never, ever make a false, false accusation like that. Ever. She's a very intelligent, very bright, very happy kid.  And not anymore.  She's not doing it just to get attention. She's not, that's not her.

Q:     You've noticed a change in her behavior after this?

A:     Instantly.  Instantly.  She doesn't want to leave the house.  She doesn't want to leave my side.  Last night was the first night that she, the first time she'd laughed and it was ha-ha.  She's a long lauger.  She's a happy kid.  She's bubbly.  She walks in a room and makes people smile.  She won't even make eye contact with men anymore.  Not even her dad.  She wouldn't even let her dad hug her.  She did that and that's not her.

(Case Supp. Report, ECF No. 10-2, PageID.229.)  How this helps Petitioner is a mystery.

Perhaps an even greater mystery, however, is why, if this testimony were so important to Petitioner, he did not call her.  She was at the trial.  (Trial Tr. II, ECF No. 21-6, PageID.807–808.)  Petitioner was aware that she was at the trial.  (*Id.*)

Samantha Black, on the other hand, was mentioned in the list of prospective witnesses, and the prosecutor did not call her to testify.  It is not clear whether she was under subpoena.  There is nothing in the trial transcripts or the transcripts of the pretrial proceedings that suggested that Samantha Black played a role in the events of the evening of the sexual assault or the events immediately afterward.

68

She is identified as a friend of the victim and other witnesses.  Moreover, Petitioner

told an investigator that, although he had never touched the victim that night, "one other time at a

party he may have touched her butt on accident . . . ." (Trial Tr. III, ECF No. 21-6, PageID.707.)

Petitioner reported that Samantha Black may have witnessed that incident.  (*Id.*)  Additionally,

Petitioner testified that Samantha Black was present days before in Petitioner's apartment when

Petitioner first mentioned that the victim could clean his saddle(s) to earn $20 for homecoming.

(*Id.*, Page.806.)  Ms. Black is not mentioned anywhere else during the trial testimony.

Petitioner points to the Case Supplemental Report authored by Detective Carson

and attached to Petitioner's amended petition.  That report includes a note of Carson's telephone

contact with Black:

> Undersigned Detective spoke to Samantha Black over the telephone . . . .  Samantha
> stated that she has been friends with [the victim] since Kindergarten.  Samantha
> was asked if she ever saw [the victim] reach her hand down [Petitioner's] pants, or
> whether [Petitioner] has forced [the victim's] hand down his pants and she stated
> "no."  Samantha stated that she has never seen [the victim] and [Petitioner] hug,
> share a kiss, or touch each other in private places.

(Case Supp. Report, ECF No. 10-2, PageID.230.)  It is not apparent how this helps Petitioner.  He

was the only one who suggested that Ms. Black perhaps saw something.  Petitioner also reports

that "Samantha Black . . . was in contact with the victim . . . by phone during the time she was at

[Petitioner's] apartment[,]" presumably on the night of the assault.  (Pet'r's Br., ECF No. 10-1,

PageID.199.)  The Court has pored over the record to find some support for Petitioner's assertion,

but can find none, and Petitioner does not cite to any record support for the assertion.

The premise of Petitioner's argument regarding these witnesses is that the

prosecutor has a duty to produce *res gestae* witnesses.  The idea that the prosecutor must produce

all witnesses "to the transaction" is a product of the English courts:

> The prosecutor in a criminal case, is not at liberty, like a plaintiff in a civil case, to
> select out a part of an entire transaction which makes against the defendant, and

then, to put the defendant to the proof of the other part, so long as it appears at all probable from the evidence, that there may be any other part of the transaction undisclosed; especially, if it appears to the court that the evidence of the other portion is attainable. The only legitimate object of the prosecution is, "to show the whole transaction, as it was, whether its tendency be to establish guilt or innocence." The prosecuting officer represents the public interest, which can never be promoted by the conviction of the innocent. His object like that of the court, should be simply justice; and he has no right to sacrifice this to any pride of professional success. And however strong may be his belief of the prisoner's guilt, he must remember that, though unfair means may happen to result in doing justice to the prisoner in the particular case, yet, justice so attained, is unjust and dangerous to the whole community. And, according to the well-established rules of the English courts, all the witnesses present at the transaction, should be called by the prosecution, before the prisoner is put to his defense, if such witnesses be present, or clearly attainable. See *Maher v. The People*, 10 Mich., 225, 226. The English rule goes so far as to require the prosecutor to produce all present at the transaction, though they may be the near relatives of the prisoner. See *Chapman's case*, 8 C. & P., 559; *Orchard's case*, *Id*., note *Roscoe's Cr. Ev*., 164.

*Hurd v. People*, 25 Mich. 405, 416, 1872 WL 3237 (Mich. Oct. 8, 1872). The principle made its way into Michigan statutes by way of a requirement that the indictment—and eventually the information—include a list of witnesses endorsed by the prosecutor. *See People v. Pearson*, 273 N.W.2d 856, 866 (Mich. 1979) ("The rule took legislative form in 1859; the statute now provides: [statutory language]. The relevant language has remained unchanged since first enacted.") (footnotes omitted). It is not so much the statutory language, however, that matters here. Instead, it is the Michigan courts' construction of that language "to require the prosecutor to indorse on the information**, *produce in court, and call all known res gestae witnesses***." *Id*. (footnote omitted, emphasis added).

That is the source of Petitioner's claim that the prosecutor must produce all res gestae witnesses—not the federal constitution, not federal law—state law. Moreover, in 1986, the Michigan Legislature eliminated the requirement that the prosecutor endorse all res gestae witnesses and the requirement that the prosecutor produce all endorsed witnesses. *People v. Koonce*, 648 N.W.2d 153, 156 (Mich. 2002); *People v. Perez*, 670 N.W.2d 655, 657–658

(Mich. 2003).  The statutory amendment "replaced the prosecutor's duty to produce res gestae witnesses with 'an obligation to provide notice of known witnesses and reasonable assistance to locate witnesses on defendant's request.'"  *Perez*, at 657–658.  There does not appear to be any question that the prosecutor fulfilled his statutory duties in Petitioner's case.  The witness list provides notice of Lowry and Black as witnesses.  There is no suggestion that Petitioner sought assistance in locating them.  Indeed, Petitioner was apparently well-aware of where they might be found.

The res gestae witness rule is, or more accurately was, purely a matter of state law. The Sixth Circuit Court of Appeals has repeatedly held that the failure of a Michigan prosecutor to produce res gestae witnesses implicates no federal right.  *See Collier v. Lafler,* 419 F. App'x 555, 559 (6th Cir. 2011) ("Michigan's requirement that prosecutors produce res gestae witnesses is a matter of state law, and its enforcement is outside the scope of our review. We have rejected on that basis claims raised under this very state requirement."); *Brown v. Burton*, No. 18-2145, 2019 WL 4865932, at *2 (6th Cir. Apr. 9, 2019) ("Brown[] claim[ed] that his Sixth and Fourteenth Amendment rights were violated when the prosecutor failed to produce two witnesses and failed to assist him in locating such witnesses. . . .  The district court concluded that Brown's claim alleged a state-law violation, which is not a basis for federal habeas relief. . . . Reasonable jurists would not debate that conclusion."); *Hatten v. Rivard*, No. 17-2520, 2018 WL 3089204, at *3 (6th Cir. May 9, 2018) ("This court has explained, however, that 'Michigan's requirement that prosecutors produce res gestae witnesses is a matter of state law, and its enforcement is outside the scope of our review.'") (quoting *Collier*); *Moreno v. Withrow*, No. 94-1466, 1995 WL 428407, at *1 (6th Cir. Jul. 19, 1995) ("Moreno's claim the prosecutor failed to call a res gestae witness, Bennett's sister, concerned a perceived error of state law which rarely serves as a basis for habeas

71

corpus relief and does so only when, under federal constitutional law, the petitioner is denied fundamental fairness in the trial process."); *Smith v. Elo*, No. 98-1977, 1999 WL 1045877, at * 2 (6th Cir. Nov. 8, 1999) ("Smith is not entitled to relief on his claim that the prosecutor failed to call res gestae witnesses because issues of state law are not cognizable on federal habeas review . . . ."); *Lewis v. Jabe*, No. 88-1522, 1989 WL 145895, at *3 (6th Cir. Dec. 4, 1989) ("[T]he res gestae requirement is a state law question.  Claims based on violations of state law are for the state courts to decide."); *Atkins v. Foltz*, No. 87-1341, 1988 WL 87710 (6th Cir. Aug. 24, 1988) ("[F]ederal law does not require production of all *res gestae* witnesses. . . . [A]lthough Michigan law requires the production of all *res gestae* witnesses . . . this court cannot hear state claims on petition for writ of habeas corpus . . . ."); *see also Grays v. Lafler*, 618 F. Supp. 2d 736, 745 (W.D. Mich. 2008) ("There is no clearly established Supreme Court law recognizing a constitutional right to a res gestae witness.").

        Habeas petitioners have attempted to "federalize" the claim that the prosecutor failed to produce a res gestae witness by contending that the prosecutor violated *Brady*, or interfered with the right to compulsory process, or the right to present a defense, or the right to confrontation; but none of those rights are at issue here.  The prosecutor plainly disclosed the existence of these witnesses and Petitioner had the police reports that he relies on now to show that their testimony mattered, so *Brady* is not implicated.  The court did not bar Petitioner from calling these witnesses, so his rights to compulsory process or to present a defense were not hampered.  And the witnesses did not testify either in court or through out-of-court statements, so Petitioner's confrontation rights were preserved.  In short, Petitioner raises only a state law claim that is not cognizable on habeas review; thus, he is not entitled to habeas relief.

72

I.      **Petitioner was denied his due process right to adequate notice of the State's intent to seek a sentence enhancement (habeas ground VIII)**

Petitioner next argues that he did not receive adequate notice of the habitual offender sentence enhancement.  Petitioner's argument is surprising in that the information (ECF No. 21-9, PageID.975–976) clearly provides notice that he is charged with two counts of CSC-I and that the prosecutor will seek a sentence enhancement because Petitioner had previously convicted of three or more felonies.  Petitioner argument is a little more subtle.  He is not complaining that he did not receive notice that his sentence for CSC-I might be enhanced because of prior convictions, he is complaining because he did not receive notice that his sentence for CSC-III might be enhanced because of prior convictions.

The nature of the habitual offender-fourth offense enhancement is spelled out in Michigan Compiled Laws § 769.12.  The enhancement was significant; it doubled the upper limit of Petitioner's guidelines minimum sentence range from 160 months to 320 months.

Petitioner notes that Michigan Compiled Laws § 769.13 governs the timing of notice of the prosecutor's intent to seek a habitual offender enhancement.  The time for notice is within 21 days of the arraignment.  Petitioner claims that he could not have received notice that his CSC-III sentence would be enhanced by prior convictions because he was not charged with CSC-III and could not know that his sentence for that crime might be enhanced until the jury's verdict.

"[A] federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'"  *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (quoting 28 U.S.C. § 2254(a)).  A habeas petition must "state facts that point to a 'real possibility of constitutional error.'"  *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Notes on Rule 4, Rules Governing Habeas Corpus Cases).

The federal courts have no power to intervene on the basis of a perceived error of state law. *Wilson*, 562 U.S. at 5; *Bradshaw*, 546 U.S. at 76; *Estelle*, 502 U.S. at 67–68. Petitioner's claim that he did not receive notice that complied with the Michigan habitual offender statute is a state-law claim that is not cognizable on habeas review.

Although the prosecutor's compliance with the Michigan statute, a state-law issue, is conclusively resolved, the issue of constitutionally adequate notice remains. The Due Process Clause of the Fourteenth Amendment mandates that whatever charging method the state employs must give the criminal defendant fair notice of the charges against him so as to provide him an adequate opportunity to prepare his defense. *See, e.g.*, *In re Ruffalo*, 390 U.S. 544 (1968); *Blake v. Morford*, 563 F.2d 248 (6th Cir. 1977); *Watson v. Jago*, 558 F.2d 330, 338 (6th Cir. 1977). This requires that the offense be described with some precision and certainty so as to apprise the accused of the crime with which he stands charged. *Combs v. State of Tennessee*, 530 F.2d 695, 698 (6th Cir. 1976). Such definiteness and certainty are required as will enable a presumptively innocent man to prepare for trial. *Id.* "Beyond notice, a claimed deficiency in a state criminal indictment is not cognizable on federal collateral review." *Roe v. Baker*, 316 F.3d 557, 570 (6th Cir. 2002) (quoting *Mira v. Marshall*, 806 F.2d 636, 639 (6th Cir. 1986)). "An indictment which fairly but imperfectly informs the accused of the offense for which he is to be tried does not give rise to a constitutional issue cognizable in habeas proceedings." *Mira*, 806 F.2d at 639. In other words, as long as "sufficient notice of the charges is given in some . . . manner" so that the accused may adequately prepare a defense, the Fourteenth Amendment's Due Process Clause is satisfied. *Koontz v. Glossa*, 731 F.2d 365, 369 (6th Cir. 1984).

Petitioner cannot legitimately claim that he did not receive notice sufficient to permit him to defend against the habitual offender "charge" in this case. The information provided

him notice that the prosecutor would seek a fourth habitual offender sentence enhancement. Defending against such an enhancement based on a CSC-III conviction is no different than defending against the enhancement for a CSC-I conviction.  He does not—and cannot—contend that the notice was insufficient to permit him to adequately prepare a defense against the enhancement.  Therefore, his claim does not implicate his due process notice rights.[24]

Moreover, Petitioner claim is based on a faulty premise.  His claim is founded on a lack of notice with regard to CSC-III charges; but because the CSC-III charge of which he was convicted was a lesser-included offense of the CSC-I charge, he in fact received all of the notice he was due.  As explained in detail above, Petitioner's CSC-III offense was a lesser-included offense of the CSC-I charge.  Therefore, the notice of the CSC-I charge necessarily provided Petitioner an opportunity to defend against the CSC-III charge.

Finally, Petitioner not only had notice of the CSC-I charge, the CSC-III charge, and the habitual offender enhancement, he had actual notice of the precise impact of the enhancement on his minimum sentence guidelines should he be convicted of CSC-I or CSC-III.  The prosecutor offered Petitioner the opportunity to enter a guilty plea to a charge of CSC-III as part of a package that included the escape plea.  The court and counsel specifically advised Petitioner that the minimum range for the CSC-I conviction would 22 years, 6 months, to 75 years and the minimum range for the CSC-III conviction would be 9 years, 9 months, to 26 years, 8 months—exactly as they were scored after Petitioner's conviction.  (Plea Tr., ECF No. 21-2, PageID.375–380.)

Petitioner's claim regarding insufficient notice is meritless.

---

[24] In fact, it was beyond dispute that Petitioner had been convicted of three prior felonies.  Two of the three felonies upon which the prosecutor relied were convictions based on Shiawassee County guilty pleas; the third was a conviction based on an Ingham County guilty plea.  (Plea Tr., ECF No. 21-2, PageID.397–399.)  Moreover, at the same time Petitioner was being prosecuted for the CSC crimes, he was being prosecuted for an attempted escape and resisting a police officer—he leapt from the police vehicle while returning from the polygraph examination relating to this case. (*Id.*, PageID.389–396.)  Petitioner pleaded guilty in the escape case and, during his plea, while under oath, acknowledged all three felony convictions.  (*Id.*, PageID.398–399.)

**J.      Trial and appellate counsel rendered ineffective assistance (habeas grounds IX and X)**

In *Strickland*, 466 U.S. 668, the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove (1) that counsel's performance fell below an objective standard of reasonableness and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  *Id.* at 687.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel*, 350 U.S. at 101).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance."  *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.

Moreover, when a federal court reviews a state court's application of *Strickland*, under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential.  *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013); *Cullen*, 563 U.S. at 190; *Premo v. Moore*, 562 U.S. 115, 122 (2011).  In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard."  *Harrington*, 562 U.S. at 105.

Despite the double deference typically owed, based on the way Petitioner's ineffective assistance of trial counsel claims were resolved in the trial court, it appears that this

Court owes no deference at all with regard to those claims—they are subject to *de novo* review. On the other hand, it appears that the Court might owe double deference to the trial court's determination that Petitioner's claims of ineffective assistance of appellate counsel have no merit. A closer examination of Petitioner's motion for relief from judgment, the trial court's resolution of that motion, and the nature of Michigan's post-conviction remedy are necessary to understand the potential difference in deference.

Michigan permits convicted criminals to file one motion for relief from judgment to challenge their convictions and/or sentences after their convictions are final. The court rules preclude relief in three instances: (1) if the convictions and sentences are not final; (2) if the grounds raised were decided against them on appeal or a prior motion (unless a retroactive change in law has undermined that decision; and (3) if the grounds raised could have been raised in a prior appeal or motion and were not. Mich. Ct. R. § 6.508(D). The rule provides two exceptions where the ground could have been raised in a prior appeal but was not: where the movant demonstrates cause for the failure to raise the claim and prejudice; or even absent cause where there is a significant possibility that the movant is innocent of the crime. Mich. Ct. R. § 6.508(D)(3). If the trial court refuses to grant relief where the issue could have been raised in a prior appeal, but was not, it is considered a procedural default.

Movants often offer as cause for failing to raise an issue on appeal the ineffective assistance of their appellate counsel. That was the theory presented by Petitioner in his motion for relief from judgment. Petitioner contended that the various issues he raised in his motion—the prosecutor's misrepresentation of the DNA evidence, the prosecutor's suppression of exculpatory evidence, the prosecutor's failure to produce res gestae witnesses, the prosecutor's defective notice regard the habitual offender sentence enhancement, the use of inaccurate information to score PRV

7, and OV 11, 13, and 19, and ineffective assistance of trial counsel—were not raised on direct appeal because of the ineffective assistance of appellate counsel.  (Pet'r's Mot. for Relief from J., ECF No. 21-10, PageID.983–984.)

The court specifically analyzed only the ineffective assistance of trial and appellate counsel claims.  The court concluded that Petitioner had not shown that either counsel rendered ineffective assistance; therefore, he had failed to establish cause and he was not entitled to relief under the court rule. The trial court described the bar to relief as to all of Petitioner's claims— apparently including his claim of ineffective assistance of appellate counsel—as a procedural default.

The court's resolution makes sense with regard to Petitioner's claims of prosecutorial misconduct and error, the use of inaccurate information at sentencing, and ineffective assistance of trial counsel.  Those claims could have been raised on appeal.  They were not.  The court concluded that Petitioner had failed to show that appellate counsel's failure to raise them was professionally unreasonable.   To the contrary, the court noted that winnowing out weaker arguments was simply part of effective appellate advocacy.  (Shiawassee Cnty. Cir. Ct. Order, ECF No. 21-11, PageID.1070.)  The court concluded that counsel was not deficient for failing to raise those arguments.  (*Id*.)

Those issues are procedurally defaulted.  This Court might rely on that default and analyze whether Petitioner has established cause and prejudice for the default.  Or, as set forth above, this Court may forego the procedural default analysis and simply address the merits if that is the more direct path to resolution.  That is the more direct path here.  But, when proceeding on that path, because the trial court did not address the claim on the merits, the trial court's decision

is not entitled to AEDPA deference.  This Court in reviewing the merits of those claims, must

review them *de novo*.

 The analysis is more difficult with regard to Petitioner's ineffective assistance of

appellate counsel claim.  The trial court reported that he denied that claim for procedural default

as well.  (Shiawassee Cnty. Cir. Ct. Order, ECF No. 21-11, PageID.1067–1068) ("Defendant now

presents his motion on numerous grounds: . . . (7) ineffective assistance of appellate counsel.  The

Court finds that Defendant's claims are barred by procedural default.").  But that does not make

much sense.  It is not that Petitioner failed to show cause and prejudice for failing to raise that

claim, it is more that counsel could not really raise a claim of his own ineffectiveness on appeal.

 Appellate counsel's ineffectiveness could not, as a practical matter, be raised by

appellate counsel on direct appeal because that approach would require appellate counsel to raise

the claims he thought were appropriate for appellate review and then raise a claim that his or her

own assistance was ineffective for not raising other lesser, inadvertently omitted, or even meritless

claims.  Such a claim slides between the various bars to relief under the court rules because it is

not a "ground[] for relief . . . which could have been raised on appeal . . . ."  Mich. Ct. R.

6.508(D)(3).  Of course, it is not the province of this Court to tell the Michigan courts how to

interpret their own procedural rules.  Indeed, the state court's interpretation binds this Court.

 Accepting the state court's conclusion that Petitioner's ineffective assistance of

appellate counsel claim is procedurally defaulted, the undersigned concludes that diving into the

federal cause and prejudice analysis complicates the analysis even more.  The more direct route to

resolution is consideration of the merits.  Again, that approach calls for *de novo* review of the

ineffective assistance of appellate counsel claim.[25]

---

[25] The same standard would apply if the Court followed the federal cause and prejudice analysis in response to the
procedural default.  In *McKinney v. Horton*, 826 F.App'x 468 (6th Cir. 2020), the Sixth Circuit concluded that the

### K.    Trial counsel was ineffective for failing to conduct an adequate investigation and present a complete defense (habeas ground IX)

Petitioner complains that his counsel rendered ineffective assistance because he failed to introduce "critical evidence"—pictures of Petitioner's identifying marks and tattoos, of which the victim did not take note—and failed to investigate the DNA evidence.

Over the course of Petitioner's motion for relief from judgment and related appeals, his original and amended petition in *Kares I*, and his original and amended petitions in this case, Petitioner has raised a number of claims regarding the ineffective assistance of counsel.  Some of those claims are raised under the specific heading for ineffective assistance of counsel claims (in the amended petition in this case, habeas ground IX).  One is raised as an add-on claim to another claim of error—the trial court erred in giving a CSC-III instruction and counsel was ineffective for failing to correct it.

#### 1.    Ineffective assistance of counsel claims specifically raised by Petitioner

In his amended petition in this case, as ground IX-ineffective assistance of trial counsel, Petitioner specifically raises two ineffective assistance of counsel claims: counsel failed to adequately investigate and present pictures of Petitioner's identifying marks and tattoos (Pet'r's Br., ECF No. 10-1, PageID.203–204); and counsel failed to investigate the DNA evidence (*Id*.).

Petitioner specifically raised additional ineffective assistance of trial counsel claims in the motion for relief from judgment in the trial court, the amended petition in *Kares I*, and the

---

reviewing court should "consider petitioner's claim that ineffective assistance of appellate counsel constitutes cause to excuse his procedural default under *Strickland*, rather than deferring to the state trial court's application of this standard."  *Id*. at 474 (citing *Willis v. Smith*, 351 F.3d 741, 745 (6th Cir. 2003) and *Hinkle v. Randle*, 271 F.3d 239, 245–46 (6th Cir. 2001)).  To the extent the trial court resolved Petitioner's ineffective assistance of appellate counsel claims on the merits, as a claim independent of Petitioner's assertion of the ineffective assistance of appellate counsel as "cause" for the procedural default, double deference is owed to the state court's determinations.  The Court's consideration of the issue yields the same result, whether review is *de novo* or doubly deferential:  Petitioner's ineffective assistance of appellate counsel claim has no merit.

initial petition in this case—counsel failed to investigate the victim's use of controlled substances, her use of her cell phone at the time of the assault, the elicitation of testimony from other witnesses, (Pet., ECF No. 1-1, PageID.62–63), Petitioner's whereabouts prior to the alleged assault to discredit the victim's claim that he bought the victim a gift, (*Kares I*, No. 1:15-cv-992, Am. Pet., ECF No. 10, PageID.91), Petitioner's text exchanges with the victim, the possibility that the semen found on and in the victim was the result of a voluntary transfer from a days-old discarded vaginal condom in Petitioner's trash (Mot. for Relief from J., ECF No. 21-10, PageID.1023–1024). His failure to include these specific issues in his amended petition in this case constitutes an abandonment of those issues.[26]  The Court will not address them.

### a.    identifying marks and tattoos

The trial court resolved Petitioner's ineffective assistance of trial counsel claim relating to the identifying marks and tattoos as follows:

---

[26] In *Braden v. United States*, 817 F.3d 926 (6th Cir. 2016), the court explained:

> "Generally, amended pleadings supersede original pleadings." *Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 617 (6th Cir. 2014). This rule applies to habeas petitions. *See Calhoun v. Bergh*, 769 F.3d 409, 410 (6th Cir. 2014)[,] *cert. denied sub nom.*[,] *Calhoun v. Booker*, —— U.S. ——, 135 S. Ct. 1403, 191 L. Ed. 2d 374 (2015). However, we have recognized exceptions to this rule where a party evinces an intent for the amended pleading to supplement rather than supersede the original pleading, *see Clark v. Johnston*, 413 F. App'x 804, 811–12 (6th Cir. 2011), and where a party is forced to amend a pleading by court order. *See Hayward*, 759 F.3d at 617–18; *but cf. Grubbs v. Smith*, 86 F.2d 275, 275 (6th Cir. 1936) (concluding that regardless of the party's intentions, an "amended and substituted petition" superseded, as a matter of law, the first petition and the first amended petition where the district court had directed the party to combine its first petition and first amended petition into one document). An amended pleading supersedes a former pleading if the amended pleading "is complete in itself and does not refer to or adopt a former pleading [.]" *Shreve v. Franklin Cty., Ohio*, 743 F.3d 126, 131 (6th Cir. 2014) (quoting 61B Am. Jur. 2d Pleading § 789).

*Braden*, 817 F.3d at 930 (footnote omitted). Here, the Court permitted Petitioner to file an amended petition on his motion. The Court specifically directed Petitioner that "**the amended petition [would] take the place of the original petition**" and "**his amended petition should set forth *all* of the grounds for relief that he intends to raise in this action**." (Order, ECF No. 9, PageID.128) (emphasis in original). Accordingly, the undersigned concludes that Petitioner's decision to eliminate the claims he had raised previously constitutes a deliberate abandonment of them.

Defendant next argues that he has identifying marks on his body of which the victim was unaware and that trial counsel was therefore ineffective for failing to introduce evidence of this fact.  The record does not support this argument.

Trial counsel cross-examined the victim as to the presence or absence of tattoos on Defendant's body.  The victim testified that she saw tattoos on the Defendant when he took off his shirt, but that she could not remember them exactly. Trial counsel also asked the victim if she remembered seeing tattoos on Defendant's thigh.  The victim testified that she believed he had no tattoos on his thigh.  In his closing, trial counsel argued that the victim's inability to identify distinguishing features on Defendant's naked body supported a finding of reasonable doubt. Defendants claims that trial counsel did not present this evidence are unfounded.

(Shiawassee Cnty. Cir. Ct. Order, ECF No. 21-11, PageID.1068–1069.)  The trial court concluded its analysis of this claim with the following:

Trial counsel presented to the jury each of the matters which Defendant now claims were not presented.  "Defendant has simply failed to overcome the strong presumption that trial counsel's performance was strategic.  Nor can we conclude that, but for counsel's alleged errors, the result of defendant's trial would have been different." . . . The Court finds that Defendant has not established the incompetence of trial counsel or prejudice suffered as a result of unprofessional errors, as required by *Strickland v. Washington*, 466 US 668, 688 (1984).

(Shiawassee Cnty. Cir. Ct. Order, ECF No. 21-11, PageID.1069–1070.)

The court's description of the victim's testimony is accurate (Trial Tr. I, ECF No. 21-5, PageID.625–626, 633–634.)  The trial court's description of counsel's closing argument is also accurate.  Counsel argued that his client testified that he had "large tattoos all over his body, and below his belt area."  (Trial Tr. III, ECF No. 21-7, PageID.886.)

But counsel failed to ever ask his client if he had a tattoo.  (Trial Tr. II, ECF No. 21-6, PageID.799–836.)  No witness ever testified that Petitioner had a tattoo, large or small, below his belt area.  Petitioner supplied an affidavit three years after his trial indicating that he has a large tattoo of a "dreamcatcher" on his thigh.  (Pet'r's Affid., ECF No. 10-2, PageID.231.)  The Offender Tracking Information System confirms that Petitioner has a "Tribal" tattoo on his left thigh.  *See* https://mdocweb.state.mi.us/otis2/otis2profile.aspx?mdocNumber=261586 (visited Feb. 2, 2021).

82

Although this claim is subject to *de novo* review, the undersigned concludes that the trial court's analysis of whether counsel's performance was professionally reasonable is an unreasonable application of *Strickland*. The trial court's suggestion that counsel's approach may have been strategic is inexplicable. It might be reasonable to not offer pictures of the tattoos, but it was patently unreasonable for counsel to argue that Petitioner had testified he had large tattoos when Petitioner never so testified and counsel never asked Petitioner or any other witness who could confirm the presence of the tattoos. In light of counsel's closing argument, it appears the omission was inadvertent; but whether inadvertent or intentional, the omission is unreasonable on this record.

The undersigned's conclusion regarding the unreasonableness of counsel's performance on the first prong of *Strickland* does not carry over to the second prong. With regard to the prejudice prong of the *Strickland* test, the Court explained "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The prejudice prong "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). Therefore, the prejudice inquiry must not focus solely on mere outcome determination; attention must be given to "whether the result of the proceeding was fundamentally unfair or unreliable . . . ." *Id.* at 369.

The undersigned concludes that counsel's error did not undermine confidence in the outcome. As the Sixth Circuit noted in *Hodge v. Hurley*, 426 F.3d 368 (6th Cir. 2005):

> A court applying *Strickland's* prejudice prong "must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695. Accordingly,

> the prejudice determination is necessarily affected by the quantity and quality of
> other evidence against the defendant.  In particular, "a verdict or conclusion only
> weakly supported by the record is more likely to have been affected by errors than
> one with overwhelming record support."  *Id*. at 696.

*Hodge*, 426 F.3d at 376 n.17.  If this case were simply a "he said/she said" credibility contest,

Petitioner's contention that a rape victim should remember the body art of a person who forcibly

penetrates her mouth and vagina with his penis might be more persuasive.  When Petitioner's

semen is found in the victim's vagina, however, the importance of that point fades quickly.

The jury clearly found the DNA evidence of singular importance in reaching its

verdict.  The testimony of the victim supported the penile/oral penetration as strongly as it

supported the penile/vaginal penetration; but the jury found Petitioner guilty of only the

penile/vaginal penetration.  The very obvious difference in proof regarding those penetrations was

the absence of DNA evidence in the victim's mouth.  Under those circumstances, the undersigned

concludes that Petitioner has failed to show that the result was unfair or unreliable because counsel

did not provide evidentiary support for Petitioner's tattoo argument.

### b.    counsel failed to investigate DNA evidence

Petitioner also claims that trial counsel failed to investigate "DNA evidence."

Petitioner refers the Court to his affidavit for additional information about this claim.  (Pet'r's Br.,

ECF No. 10-1, PageID.203.)  The affidavit explains further that Petitioner's counsel failed "to

investigate into the presen[c]e of any foreign substances within the DNA sample to establish that

it was a transfer from another object."  (Affid., ECF No. 10-2, PageID.231.)  This argument,

therefore, does not relate to the bedding or the untested swabs or smears.  The argument relates to

Petitioner's contention that the victim herself deposited Petitioner's semen in her vagina by

transferring it from a used female condom that Petitioner reports was thrown in his bathroom trash

a few days before the alleged criminal sexual conduct.

Petitioner's claim that counsel did nothing to investigate Petitioner's semen transfer claim is unsupported in the record.  Counsel was plainly aware of Petitioner's theory.  Counsel asked forensic scientist Campbell if she tested the items collected from the victim for "any other substances, lubricant, spermicides, or anything like that?"  (Trial Tr. II, ECF No. 21-6, PageID.735.)  She said no.  (*Id.*)  Similarly, counsel asked forensic scientist Bruski, "Was there any testing of foreign substances in the sampling that was given to you?  I mean did you test for anything else, foreign substances?"  (*Id.*, PageID.763.)  She also said no.  (*Id.*, PageID.763–764.)  Counsel specifically explored with scientist Bruski the possibility of semen transfer from a vaginal condom.  (*Id.*, PageID.764–765.)  She testified that if semen were transferred from a vaginal condom, you would expect to see DNA carryover from that third person.  (*Id.*)  There was no such carryover in the samples tested by scientist Bruski.  (*Id.*)

Moreover, there is nothing in the record that forecloses the possibility that counsel in fact investigated the presence of foreign substances through the expert hired to conduct independent testing.  It may be that such testing was conducted and it did not support Petitioner's claim.  It may be that such testing was not conducted because the prospect of no test results—and no actual tests by the prosecutor's experts to rule out the possibility—put Petitioner in a better position to argue reasonable doubt.

In any event, Petitioner has failed to show that counsel did not investigate the claim. Counsel certainly explored the issue with the government's experts, and he had planted a seed of doubt as to whether the samples might have revealed foreign substances if only they had been thoroughly tested.  Counsel was able to argue that absent such testing there was reasonable doubt.

Unfortunately, Petitioner's argument regarding the victim's transfer of Petitioner's semen into her own vagina by inserting a days-old, discarded, used vaginal condom, was far-

fetched.  If that actually happened, the third party's DNA should have shown up in the samples and it did not.  The flaw was in Petitioner's theory, not his counsel's performance.  Based on the record before the Court, it appears counsel did the best that he could with an unconvincing theory. Therefore, Petitioner has failed to show that counsel's performance was professionally unreasonable.

### 2.  Counsel's request for the CSC-III instruction

As explained above in connection with Petitioner's base claim that the court erred in providing the CSC-III instruction, *see* § IV. E., above, there may be strategic reasons to forego a lesser-included offense instruction—the "all or nothing" strategy—or to seek a lesser-included offense instruction—the "third option" strategy.  The Supreme Court in *Keeble* explained that the theory of "all or nothing" may not work:  "Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction."  *Keeble*, 412 U.S. at 212–13.

In Petitioner's case, the DNA evidence was compelling.  Petitioner's semen was identified on cervical swabs taken from the victim.  Counsel might understandably have concluded that the jury would find Petitioner "guilty of some offense."  Moreover, the CSC-III offense offered significant potential for a lower minimum sentence than the CSC-I offense.  The CSC-III minimum range was 9 years, 9 months, to 22 years, 8 months.  (Plea Hr'g Tr., ECF No. 21-2, PageID.376.) The CSC-I minimum range was 22 years, 6 months, to 75 years.  (*Id*.)  The "third option" strategy was inherently reasonable under the circumstances.  Therefore, Petitioner has failed to show that counsel's active seeking of the CSC-III instruction was professionally unreasonable.  Petitioner is not entitled to habeas relief on this ineffective assistance claim.

**L.    Appellate counsel was ineffective by failing to raise meritorious issues on direct appeal resulting in prejudice to Petitioner's appeal (habeas ground X)**

Petitioner has also raised many claims that appellate counsel rendered ineffective assistance because he failed to raise claim on Petitioner's direct appeal.  The Court will not address every claim Petitioner has raised in the state court, in *Kares I*, or in his initial petition in this case. In his brief supporting the amended petition in this case, Petitioner states: "[Petitioner] has presented numerous issues herein that his Appellate Counsel failed to include[] within his direct appeal."  (Pet'r's Br., ECF No. 10-1, PageID.205.)  Accordingly, the Court will limit its analysis to claims that fit that description:  claims that appellate counsel did not raise on appeal and that Petitioner raised in his amended petition.

The *Strickland* standard applies to ineffective assistance of counsel claims directed to the conduct of appellate counsel as well.  But that which is professionally reasonable for appellate counsel may be different than that which is professionally reasonable for trial counsel. An appellant has no constitutional right to have every non-frivolous issue raised on appeal. "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy."  *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)).  To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions."  *Strickland*, 466 U.S. at 689.  As the Supreme Court has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another.  *Smith v. Robbins*, 528 U.S. 259, 287–88 (2000).  In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present."  *Id.* at 288.  Moreover, if the argument

appellate counsel failed to raise was meritless, the failure cannot be ineffective assistance of counsel. "Omitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013).

### 1. Hearsay/Confrontation (habeas ground I)

Appellate counsel raised the hearsay issue on direct appeal. Counsel did not specifically mention the potential Confrontation Clause violation. But, as noted above, Petitioner's Confrontation Clause argument is meritless because the victim, who uttered the out-of-court statement repeated by the SANE, testified at trial. Accordingly, Petitioner cannot establish either *Strickland* prong.

### 2. Sentence Guideline Scoring issues (habeas ground II)

Appellate counsel raised issues regarding the scoring of Offense Variables 3, 8, and 10. So counsel cannot be accused of ineffectiveness for failing to challenge the scoring of those variables.

Counsel did not raise the *Alleyne* judge-found facts issue. But Petitioner did not raise the ineffective assistance of appellate counsel based on failure to raise the *Alleyne* issue until he filed his Michigan Court of Appeals application for leave to appeal the denial of his motion for relief from judgment. That issue, therefore, remains unexhausted. Moreover, there is no remedy that remains in the state courts. Therefore, to continue with the issue in this Court, Petitioner must demonstrate cause for his failure to exhaust the issue in the state courts. Petitioner's failure to exhaust follows from his failure to raise the issue in his *pro per* motion for relief from judgment or in a procedurally appropriate manner in his subsequent appeals. He offers no cause for those failures. Accordingly, the doctrine of procedural default precludes the Court's consideration of his ineffective assistance of counsel claim based on *Alleyne* the same way it precludes the Court's consideration of the *Alleyne* issue in the first instance.

Counsel did not raise the "acquitted conduct" issue on appeal. That failure, however, was not professionally unreasonable. *Watts*, on the federal level, and *Ewing*, on the state level supported counsel's decision to not pursue such a claim at the time of Petitioner's appeal. Thus, the failure to raise the issue was not professionally unreasonable. As with the *Alleyne* issue, however, Petitioner has not exhausted this claim—he did not raise it in his *pro per* motion for relief from judgment. He no longer has a remedy. The failure to exhaust is not attributable to counsel—it is Petitioner's fault. So there is no cause for the failure and procedural default bars this claim.

Counsel did not raise the "inaccurate information" claim with regard to Offense Variable 19. Petitioner raised it in his motion for relief from judgment. For the reasons stated above, the issue is meritless. Therefore, it was not professionally unreasonable for counsel to fail to raise it, nor was it prejudicial.

Petitioner alleges additional straightforward guidelines scoring error claims with regard to PRV 7, OV 11, and OV 13. The trial court scored PRV 7 at 20 points for Petitioner's commission of two subsequent felonies. Mich. Comp. Laws § 777.57. The guideline calls for scoring felonies committed after the sentencing offense was committed. Petitioner was convicted of escape and resisting a police officer as set forth above. He complains because there are consecutive sentence implications from those convictions; but the statutory limitation on scoring convictions with mandatory consecutive sentences applies to concurrent felonies, not subsequent felonies. Counsel's failure to raise this frivolous issue was neither professionally unreasonable nor prejudicial.

Offense Variable 11 is the multiple penetration variable. For the reasons set forth above, the points scored for multiple penetrations were appropriate under the guideline and well-

supported by the record.  Appellate counsel's failure to challenge the scoring on appeal was neither professionally unreasonable nor prejudicial.

Offense Variable 13 relates to a pattern of criminal activity.  As explained above, Petitioner's complaint regarding the scoring of this variable shifted focus every time he raised it. Whatever claim he intends to raise on habeas review is unexhausted and no remedy remains.  Any ineffective assistance of counsel claim based on the shifting sands of Petitioner's argument is likewise unexhausted and procedurally defaulted.  Petitioner's failure to exhaust is his fault, not counsel's.  Accordingly, there is no cause that would permit the court to overlook Petitioner's procedural default of this issue.

### 3.  The CSC-III lesser-included offense instruction (habeas ground III)

For the reasons stated above, it was not error for the court to give the instruction and it was not ineffective assistance for counsel to request it.  Appellate counsel's failure to raise those meritless claims is neither professionally unreasonable nor prejudicial.

### 4.  The trial court's failure to find cause and prejudice on Petitioner's motion for relief from judgment (habeas ground IV)

The trial court's alleged failures in resolving Petitioner's motion for relief from judgment had not occurred yet when counsel represented Petitioner on appeal.  Therefore, counsel's failures to raise those issues on appeal was neither professionally unreasonable nor prejudicial.

### 5.  The prosecutor's misrepresentation of DNA evidence to the jury (habeas ground VI)

The prosecutor did not misrepresent DNA evidence to the jury.  Counsel's failure to raise that issue on appeal was, therefore, neither professionally unreasonable nor prejudicial.

### 6.    The prosecutor's suppression of exculpatory evidence (habeas ground VI)

The prosecutor did not suppress exculpatory evidence.  Counsel's failure to raise that issue on appeal was, therefore, neither professionally unreasonable nor prejudicial.

### 7.    The prosecutor's failure to produce endorsed res gestae witnesses (habeas ground VII)

The prosecutor was not required to produce endorsed res gestae witnesses. Counsel's failure to raise that issue on appeal was, therefore, neither professionally unreasonable nor prejudicial.

### 8.    The prosecutor's notice of the habitual offender sentence enhancement (habeas ground VIII)

Petitioner had all appropriate notice of the habitual offender sentence enhancement and all CSC charges.  Counsel's failure to raise that issue was, therefore, neither professionally unreasonable nor prejudicial.

### 9.    Ineffective assistance of trial counsel (habeas ground IX)

Trial counsel did not render ineffective assistance.  Counsel's failure to raise those issues were, therefore, neither professionally unreasonable nor prejudicial.

### 10. The trial court's denial of postconviction DNA testing (habeas ground XI)

The trial court did not deny Petitioner's request for postconviction DNA testing until after Petitioner's direct appeal had been finally resolved.  Counsel could not raise the issue before it happened.  Any failure to raise the issue, therefore, was neither professionally unreasonable nor prejudicial.

### Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted.  A certificate should issue if Petitioner has demonstrated a

"substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam).  Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.*  Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  *Murphy*, 263 F.3d at 467.  Consequently, I have examined each of Petitioner's claims under the *Slack* standard.  Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.*  "A petitioner satisfies this standard by demonstrating that . . . jurists of reason could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

Because the tolling effect of Petitioner's motion for DNA testing is an issue of first impression in the Sixth Circuit, reasonable jurists could conclude that the Court's dismissal of Petitioner's claims as untimely is debatable or wrong.  I recommend that the Court grant a certificate of appealability on that issue.

With regard to the merits of Petitioner's claims, however, I find that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims would be debatable or wrong.  Therefore, I recommend that the Court deny Petitioner a certificate of appealability as to all other issues.

Moreover, although I conclude that Petitioner has failed to demonstrate that he is in custody in violation of the constitution and has failed to make a substantial showing of a denial of a constitutional right, because of the tolling issue, I would not conclude that any issue Petitioner might raise on appeal would be frivolous.  *Coppedge v. United States*, 369 U.S. 438, 445 (1962). Absent that issue, however, I would conclude that any issue Petitioner might raise on appeal would be frivolous.

### Recommended Disposition

For the foregoing reasons, I recommend that the habeas corpus petition be denied. I further recommend that a certificate of appealability be denied with regard to all issues except the issue regarding the tolling impact of Petitioner's postconviction motion for DNA testing. Finally, I recommend that the Court not certify that an appeal would not be taken in good faith because of the tolling issue.  Nonetheless, if the Court were to bypass the timeliness issue and dismiss the petition because it has no merit, I would conclude that any issue Petitioner might raise on appeal would be frivolous.

Dated:    April 23, 2021                                   /s/ *Maarten Vermaat*

                                                                                         Maarten Vermaat
                                                                                         United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).